Jim **FAIR**, individually and as an elected official in the State of Florida, Morton A. Tucker, Dorothy Weidemann and Gilbert O. Weidemann, individually and as registered qualified voters of Hillsborough County, Florida; and all others similarly situated, Plaintiffs,

v.

Claude **R. KIRK, Jr.**, as Governor of the State of Florida, John E. Matthews, as President of the Senate of Florida, Frederick B. Karl, as Chairman of the Select Committee on Executive Suspensions of the Florida Senate, Joseph G. Spicola, Jr., as State Attorney, Hillsborough County, and Tom Adams, as Secretary of the State of Florida, and their successors in each office, Defendants.

Civ. A. No. 1611.

United States District Court,
N. D. Florida.

Sept. 15, 1970.

Norman Siegel, Charles Morgan, Jr. and Reber Boult, Jr., Atlanta, Ga., for plaintiffs.

Earl Faircloth, Atty. Gen., and T. T. Turnbull, and Roger W. Foote, Asst. Attys. Gen., for defendants.

Before DYER, Circuit Judge, and ARNOW and MIDDLEBROOKS, District Judges.

DYER, Circuit Judge:

Jim Fair, former Supervisor of Elections in Hillsborough County, Florida, here challenges the constitutionality of article IV, section 7 of the Florida Constitution.[1] In this proceeding before a three-judge district court,[2] Fair claims that this constitutional provision, under which Governor Claude Kirk suspended him from office, violates the due process clause of the United States Constitution. Specifically, he contends that article IV, section 7 denied him the opportunity to be heard and to refute the allegations against him, prior to the governor's suspension order. Moreover, he asserts that this constitutional provision is void for vagueness and overbreadth.

In November 1968, Fair was elected to the office of Supervisor of Elections in Hillsborough County; he assumed office on January 7, 1969. On April 7, 1970, State Circuit Judge I. C. Spoto impaneled a grand jury to investigate the Supervisor of Elections in Hillsborough County. The grand jury issued its report on April 13, 1970. After publishing copious findings of fact concerning

---

1. Article IV, § 7 of the Florida Constitution, F.S.A. provides in pertinent part:

(a) By executive order stating the grounds and filed with the secretary of state, the governor may suspend from office any state officer not subject to impeachment, * * * or any county officer, for malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform his official duties, or commission of a felony, and may fill the office by appointment for the period of suspension.

(b) The senate may, in proceedings prescribed by law, remove from office or reinstate the suspended official and for such purpose the senate may be convened in special session by its president or by a majority of its membership.

2. See 28 U.S.C.A. §§ 2281, 2284.

Fair's conduct in office, the grand jury concluded that this conduct constituted "malfeasance, misfeasance and neglect of duty * * * under the election laws of the State of Florida" and "under those laws regulating the conduct of public officers * * *." Accordingly, the grand jury recommended "[t]hat the Governor of the State of Florida exercise his authority under Article IV, Section 7, of the Constitution of the State of Florida, and related statutes, to suspend the Supervisor of Elections of Hillsborough County and to appoint a qualified person to fill the office so vacated until such time as the Senate of the State of Florida can act upon the suspension." [A copy of the grand jury's report is included as Appendix A of this opinion.]

Governor Kirk wasted no time in implementing the grand jury's recommendation. On April 14, 1970, Kirk suspended Fair from the office of Supervisor of Elections "on the grounds of misfeasance, malfeasance, neglect of duty and incompetency in office, as reflected by the report of the Grand Jury of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida * * *." The Governor incorporated a copy of the grand jury report in his suspension order.

Following notification by the Secretary of State, and upon due notice, the Select Committee on Executive Suspensions of the Florida senate held hearings in regard to the possible removal of Fair from office. The Committee heard testimony from forty-three witnesses, received thirty-seven exhibits, and considered various motions filed by Fair's attorneys. Fair does not claim that the Committee failed to afford him procedural due process. Based on the testimony heard and evidence introduced at the hearings, the Select Committee recommended to the senate that Fair be removed from office. The senate followed this recommendation, voting to remove Fair on July 8, 1970.

Because Fair has attacked the constitutionality of a provision of the Florida Constitution, this case is properly before a three-judge court. 28 U.S. C.A. §§ 2281, 2284. Jurisdiction is conferred by 28 U.S.C.A. §§ 1331(a) and 1343(3). The sole question which we need consider involves the constitutionality of article IV, section 7: Fair's only serious contention is that this provision denied him procedural due process, the right to be heard and to refute the charges against him prior to suspension, under the fourteenth amendment. No other issue presented in Fair's complaint merits three-judge consideration.[3]

At the outset, we may assume, as the Supreme Court of Florida has declared, that a public officeholder has a property right in his office and that this right may not be unlawfully taken away or illegally infringed. *See* Piver v. Stallman, Fla.App.1967, 198 So.2d 859, 862. Consequently, before a public official may be expelled or discharged from office upon a ground involving criminal guilt or individual disgrace, he is entitled to such notice and hearing as due process of law requires. McCarley v. Sanders, M.D.Ala.1970, 309 F. Supp. 8; *see* Slochower v. Board of High-

---

3. Assuming *arguendo* that all other plaintiffs, who are voters in Hillsborough County, have standing to sue, it is clear that the removal of Fair does not deny them equal protection of the laws. *See* Williams v. Rhodes, 1968, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24; Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497; Wetherington v. Adams, N.D.Fla.1970, 309 F.Supp. 318. *See also* Flast v. Cohen, 1968, 392 U.S. 83, 102–103, 88 S.Ct. 1942, 20 L.Ed.2d 947; Bond v. Floyd, 1966, 385 U.S. 116, 137 n. 14, 87 S.Ct. 339, 17 L.Ed.2d 235; Fairchild v. Hughes, 1922, 258 U.S. 126, 129, 42 S.Ct. 274, 66 L.Ed. 499.

Likewise, Fair's argument alleging that the Florida constitutional provision is void because of vagueness and overbreadth is totally lacking in merit. *See* Jordan v. De George, 1951, 341 U.S. 223, 231–232, 71 S.Ct. 703, 95 L.Ed. 886; Connally v. General Construction Co., 1926, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322.

er Education, 1956, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692.

In the present controversy, the issue is not *whether* Fair is entitled to notice and opportunity to be heard; instead, it is *when* may he exercise this right. Fair does not deny that he was given a hearing before the Select Committee on Executive Suspensions or that he was afforded procedural due process —as stipulated by the Florida statute, Laws of Fla. ch. 69–277, § 8 [4]—during the committee proceedings. He asserts merely that the governor should have given him notice and an opportunity to be heard before suspending him. We find no pertinent legal precedent to substantiate this contention.

Long ago, in a similar case, the United States Supreme Court recognized that the act of a governor in suspending a public official is not a finality. Wilson v. North Carolina, 1898, 169 U.S. 586, 591, 18 S.Ct. 435, 42 L.Ed. 865. Noting that the state legislature had the ultimate power to remove or reinstate a suspended officer, the Court declared:

> The controversy relates exclusively to the title to a state office, created by a statute of the State, and to the rights of one who was elected to the office so created. Those rights are to be measured by the statute and by the constitution of the State, excepting in so far as they may be protected by any provision of the Federal Constitution.
>
> \* \* \* \* \* \*
>
> \* \* \* What kind and how much of a hearing the officer should have

before suspension by the Governor was a matter for the state legislature to determine, having regard to the constitution of the State. The procedure provided by a valid state law for the purpose of changing the incumbent of a state office will not, in general, involve any question for review by this court. A law of that kind does but provide for the carrying out and enforcement of the policy of a State with reference to its political and internal administration \* \* \*.

*Id.* at 592, 593, 18 S.Ct. at 438. Though procedural due process requirements have multiplied in other areas, *Williams* retains vitality. Given each state's manifestly legitimate interest in maintaining the integrity of its public offices, the Court's rule remains sound. "We should be very reluctant \* \* \* in an action of this nature, to supervise and review the political administration of a state government by its own officials, and through its own courts." *Id.* at 596, 18 S.Ct. at 439.

It is true that in *Williams* the plaintiff "appeared [before the governor], and denied in writing the various charges contained in the governor's communication, after which, in explanation of the charges, he made a written statement in regard to them." *Id.* at 587, 18 S.Ct. at 436. However, he was given no opportunity to view the evidence or to confront his accusers and cross-examine witnesses. *Id.* at 587–588, 18 S.Ct. 435. Moreover, the state statute in effect at that time did not specifically provide for any pre-suspension hearing. In reality Williams' appearance was *pro forma:*

4. Section 8 provides:

The senate shall afford each suspended official a hearing before a select committee, master or examiner, and shall notify such suspended official of the time and place of the hearing sufficiently in advance thereof to afford such official an opportunity fully and adequately to prepare such defenses as the official may be advised are necessary and proper, and all such defenses may be presented by the official or his attorney. In the furtherance of this provision the senate shall adopt suf-

ficient procedural rules to afford due process both to the governor in the presentation of his evidence and to the suspended official, but in the absence of such adoption, this section shall afford a full and complete hearing, public in nature, as required by the state constitution. However, nothing in this act shall prevent either the select committee or the senate from conducting portions of the hearing in executive session if the senate rules so provide. Laws of Fla. ch. 69–277, § 8.

it did nothing to advance his cause or to delay his suspension.

In the instant case, Fair received no hearing prior to his suspension. The Florida statute enacted pursuant to article IV, § 7 authorizes a hearing after suspension but prior to removal. Laws of Fla. ch. 69–277, § 8. *Prima facie* this fact distinguishes Fair's case from Williams'. Nevertheless, the distinction lacks substance. Clearly a personal denial of the grand jury's charges could not have exonerated Fair, unless, perhaps, he also received the opportunity to confront his accusers and to cross-examine witnesses. Under the *Williams'* rationale, Fair had no inherent right to such an opportunity. Thus, he was in no worse position without a hearing than was Williams after an appearance in the governor's office.

To further substantiate his contention that a hearing is prerequisite to suspension, Fair relies on two cases in which federal courts ordered pre-suspension hearings for college students. In Knight v. State Board of Education, M.D.Tenn. 1961, 200 F.Supp. 174, the district court determined that indefinite suspension of college students without hearings violated their right to due process. The students had been suspended after a Mississippi magistrate's court convicted them of disorderly conduct resulting from their "freedom riding" activities in that state. Limiting its consideration to "the present record", the district court declared:

It is undeniable, in the first place, that the plaintiffs in being suspended, although they were given the conditional right to be reinstated if and when their Mississippi convictions should be reversed, were deprived of a valuable right or interest, i. e., the right or interest to continue their training at a university of their choice. * * * *Indefinite suspension pending the appeals of the Mississippi convictions through the various higher courts with attendant delays and uncertainties might well be for practical pur-* *poses the equivalent of outright expulsion. Id.* at 178 (emphasis added).

Likewise in Stricklin v. Regents of University of Wisconsin, W.D.Wis. 1969, 297 F.Supp. 416, aff'd on other grounds, 7 Cir. 1970, 420 F.2d 1257, another district court mandated hearings for college students, before they could be suspended for disorderly conduct on campus. "Unless the element of danger to persons or property is present, suspension should not occur without specification of charges, notice of hearing, and hearing." 297 F.Supp. at 420. On appeal, the Seventh Circuit refused to review this holding, which had been mooted by subsequent developments. 420 F.2d at 1259–1260.

Thus, absent special circumstances, there has been no definitive determination that anyone deserves a pre-suspension hearing. Moreover, the contrast between the present situation and those found in *Knight* and *Stricklin* is striking. In neither student case did the plaintiffs occupy decision-making positions in the university government. At stake was their "right" to continue attending classes, not their right to make decisions which could affect the whole university community. Consequently, balancing the interests of the state with those of the individuals involved, the district courts decided that individual interests should prevail. Utilizing that same technique, we find the state's interest predominates in the factual context of this case. As the Supreme Court has commented, "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy, 1961, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–1749, 6 L.Ed.2d 1230. We cannot overlook the fact that Fair and other public officials are decision makers whose actions often affect the whole community in which they operate.

This does not mean that the suspended official is never entitled to a full hearing, with the opportunity to confront his accusers and to cross-examine witnesses, prior to removal. Due process requires notice and an *opportunity* to be heard before removal or expulsion from public office. McCarley v. Sanders, *supra*, 309 F.Supp., at 11; *see* Dixon v. Alabama State Bd. of Educ., 5 Cir. 1961, 294 F.2d 150, 155. Cognizant of the definitional difference between "suspension" and "removal", we hold merely that eradication of corrupt practices in state government is such an important responsibility that suspension of a public official prior to a hearing may be consonant with due process. In a case such as this, the state interest in utilizing suspension to preserve the integrity of its offices surely outweighs any individual interest in a pre-suspension hearing. Neither Fair nor any other plaintiff in his position suffers irreparable harm as a result of the suspension, for he may still plead his case in the senate during removal proceedings. In effect, the governor proposes, but the legislature disposes. Hence, we find that article IV, § 7 of the Florida Constitution advances a legitimate state interest without unduly interfering with the individual's right to procedural due process. *Cf.* Hadnott v. Amos, 1969, 394 U.S. 358, 364, 89 S.Ct. 1101, 22 L.Ed.2d 336.

Fair's claim for relief must fail. Judgment for defendants will be entered upon submission.

## APPENDIX A

REPORT OF THE GRAND JURY— SPRING TERM—1970 ON THE OPERATION OF THE OFFICE OF SUPERVISOR OF ELECTIONS, HILLSBOROUGH COUNTY, FLORIDA

### INTRODUCTION

This Grand Jury was impaneled on April 7, 1970, by the Honorable I. C. Spoto, Circuit Judge for the Thirteenth Judicial Circuit, in and for Hillsborough County, Florida, and the members hereof have taken an oath to make diligent inquiry into the charges given it by the Court.

Pursuant to that responsibility, the Grand Jury has been asked to inquire into allegations of irregularities in the operation of the Office of Supervisor of Elections for Hillsborough County, Florida.

This Grand Jury has been advised as to its authority to inquire into and report on this matter by Joseph G. Spicola, Jr., State Attorney for the Thirteenth Judicial Circuit, in and for Hillsborough County, Florida, and would include herein a brief statement of the legal authority for this report, as provided by Mr. Spicola. Grand juries are charged with the duty of investigating county offices, buildings, institutions, and officers, and to make due presentment concerning their physical, sanitary and general condition. If a grand jury in the course of its investigation of general public affairs finds that neglect or ineptitude are responsible for undesirable conditions, they may so report, even though their report incidentally points to an official or officials as responsible for the conditions. With the above authority in mind, it is the duty of the grand jury in investigating matters relating to the public health, welfare and morals, not to single out a public official for censure or reprobation, but to report on specific matters which lead the grand jury to conclude that that public official has not performed or is not performing his duties in accordance with the laws of the State of Florida and in the interest of the public welfare.

This Grand Jury has delved fully and impartially into the allegations of irregularities respecting the Office of Supervisor of Elections. The Grand Jury has been in session for five (5) days with regard to the inquiry herein, and, during that period, has devoted its full attention to this matter.

Recognizing that the Supervisor of Elections of Hillsborough County, Flori-

da, hereafter referred to as the Supervisor, is an elected public official, and the gravity of the charges made against him, the Grand Jury feels that only a full review of the allegations will serve the ends of justice to all involved. Furthermore, this Grand Jury feels that the right to vote is one of our most precious rights, and, in order to ensure that this right is not endangered, has undertaken a thorough examination to determine whether any public official or employee has failed to carry out his sworn duties in this regard under the Constitution and laws of the State of Florida.

## NATURE OF THE CHARGES

I. It is alleged that the Supervisor has failed and refused to properly discharge his duties under the election laws of the State of Florida.

II. It is alleged that the Supervisor has failed and refused to discharge his duties in accordance with the laws pertaining to public officers of the State of Florida.

III. It is alleged that the Supervisor has engaged in improprieties relating to personnel and office management practices.

## TESTIMONY AND EXHIBITS

I. Testimony. The Grand Jury heard testimony from the following persons:

Anthony Frederic—former Chief Deputy

Dorothy W. Glisson—Secretary of State's Office

Blanche Work—Supervisor of Elections, Polk County

Wilda Cook—Supervisor of Elections, Pinellas County

Bessie LoScalzo—former permanent civil service employee

Connie Leto—former permanent civil service employee

Dahlia Gomez—former permanent civil service employee

Cynthia Daniel—former permanent civil service employee

Pat Frederic—former permanent civil service employee

Emory Cook—manager, freight warehouse

Tom McBride—former temporary employee

Conrad J. George—owner, George's Used Furniture

John King—present temporary employee

David Bolton—present temporary employee

Kerry Drake—present temporary employee

Richard Sampey—present temporary employee

Benjamin Rosenberg—former temporary employee

Henry Pfeil—present temporary employee

Marion Crawford—former temporary employee

Alex Taylor—Tampa Police Department, Intelligence

Mercedes Favata—Information Desk, County Courthouse

W. G. Boyer—Assistant County Building Supervisor

Mike Roskiwski—present temporary employee

Tommy F. Farrell—present temporary employee

Dorothy L. Weidemann—present temporary employee

Mike Elam—present temporary employee

Carolyn Gordon—present temporary employee

Alton Strong—County purchasing agent

Nan Robertson—former temporary employee

Ronald Hoffer—present temporary employee

Janice West—present temporary employee

II. Exhibits. The Grand Jury has reviewed the following exhibits:

Payroll records
Employee records
Purchase requisitions
Travel vouchers
Precinct index
Purge cards and precinct maps
Photographs
Legal documents
Correspondence and miscellaneous records from Supervisor

## FINDINGS OF FACT

I. Matters relating to the election laws.

A. Purge of voter registration rolls.

The Office of the Supervisor failed to properly remove the names of those voters who have not voted during the past four years in accordance with the special act and general legislation pertaining to the voter registration rolls of Hillsborough County, hereinafter referred to as the purge. The last purge of the voter registration rolls was accomplished in 1965.

On January 7, 1969, the date that the Supervisor took office, the names of approximately 31,900 voters who had not voted in the last four years had been removed from the master registration rolls in the Office of Supervisor. On that date, the Hillsborough County Commission had theretofore appropriated a sufficient budget to enable the Office of the Supervisor to accomplish the 1969 purge. From the date the Supervisor took office, no work was accomplished in the year 1969 on the voter registration purge. The five permanent employees then working in the Office of the Supervisor prepared proposed cards for the purpose of notification of voters whose names had been removed from the master rolls, but said proposed cards were rejected numerous times for no apparent reason by the Supervisor. It was alleged that on January 31, 1970, the Supervisor caused only 25 purge cards of his own design to be sent out in an apparent effort to comply colorably with the election laws. The purge cards which had been prepared by the permanent employees and rejected by the Supervisor were simple and effective, and followed the pattern of purge cards used in past years; but the cards designed and sent out by the Supervisor bore his name in several places and had the overtones of political advertisement for the Supervisor himself.

During the latter part of February and the first part of March, 1970, the Supervisor engaged the services of personnel outside the Office of the Supervisor to distribute purge cards to the entire registration roll, numbering some 210,000 voters. Because said purge cards were sent out in envelopes containing a precinct map and other materials, the purge cards bore no postmark, the result being that the time for compliance with notification, as required by the special and general laws, could not be calculated. Distributed with said purge cards were maps which called on each voter to designate his proper voting precinct. Said maps were unclear and confusing, to the extent that thousands of errors were made by voters in designating their proper precincts.

Those purge cards returned to the Office of the Supervisor were improperly handled and misfiled, resulting in an inability on the part of the Office of the Supervisor to notify those voters who did not respond to the purge cards. Some 30,000 cards to which no response was made are stored outside the Office of the Supervisor, and no attempt has been made to either correct the master voter registration rolls or to notify the unresponding voters with respect to those cards.

Untrained temporary personnel have been placed in charge of the voter registration purge, whereas experienced permanent personnel were assigned to other duties prior to their discharge referred to hereinunder.

The provisions of the aforementioned laws require that the voter registration purge shall have been complet-

ed by no later than March 30, 1970. At the present time, purge cards are still being distributed and are still being returned to the Office of the Supervisor.

B. Display of irregular ballots without Court Order.

In the month of January, 1969, after the Supervisor had taken office, an unsuccessful candidate in a county-wide election which had been held the preceding November, requested viewing of all write-in ballots from that election. Said ballots had been sealed and locked in the Office of the previous Supervisor. When the present Supervisor took office, said ballots were removed from lock and key and kept in an open box in the outer part of the office.

The write-in ballots from each precinct were kept in the boxes in sealed envelopes. At the direction of the Supervisor, his employees unsealed and opened the envelopes and displayed the write-in ballots to the party requesting them, without supervision of said display by the Supervisor. The Supervisor had knowledge, or should have had knowledge, that a Court Order was necessary, according to the provisions of the election laws, for the display of sealed irregular ballots prior to the time said ballots were displayed to the party requesting them.

C. Splitting and combining of precincts.

The splitting of Precinct 49B into new precincts 49B, 49E, 49F and 49G was ordered by the Election Board in the month of December, 1969. Pursuant to said order, the permanent employees of the Office of the Supervisor separated the names of those voters who were affected by the split. No further action was taken upon the direction of the Supervisor. No action had been undertaken by the Office of the Supervisor to accomplish the split of Precinct 49B as late as March 27, 1970.

The combining of Precincts 34 and 35 also was ordered by the Election Board in the month of December, 1969. The permanent employees of the Office of the Supervisor began to combine the names of voters in Precincts 34 and 35, but were stopped by the Supervisor. No further action had been taken regarding combining the precincts as late as March 27, 1970.

Testimony presented before the Grand Jury indicates numerous instances in which the Election Board had ordered splitting and combining of precincts or alterations of the precinct boundaries. Said testimony further reflects that the orders of the Election Board in these regards have not been complied with by the Office of the Supervisor, which will undoubtedly result in lack of notification to voters of their proper precincts.

D. Mailing of absentee ballots to servicemen.

The evidence presented to the Grand Jury revealed that upon notification by the Office of the Governor of the State of Florida that a special election was to be held in Hillsborough County on April 21, 1970, no immediate steps were taken regarding the mailing of absentee ballots to servicemen stationed outside the County. The evidence reflects that said mailing was begun only upon afterthought by the employees of the Office of the Supervisor.

There is no testimony before this Grand Jury reflecting that said mail has been completed or will be completed in time for the aforementioned special election.

II. Matters relating to laws governing conduct of public officers.

A. Self-dealing.

In the month of March, 1969, the Supervisor submitted a requisition to the County Purchasing Department requesting the purchase of several dictionaries and encyclopedia from a con-

cern known as Sterling Exchange. The Purchasing Department officers, after being unable to find such a firm established for the purpose of doing business in Hillsborough County, perceived that the address of the Sterling Exchange firm was the same as the private warehouse owned and operated by the Supervisor. The Supervisor was advised by the Purchasing Department that such a requisition appeared to present a conflict of interest on the part of the Supervisor and rejected the requisition.

In the month of July, 1969, the Supervisor approached a local businessman dealing in office furniture and arranged to trade a desk to him in return for certain other items of furniture. Shortly thereafter, the Supervisor purchased said desk for use in his office at the expense of the County.

On another occasion, the Supervisor approached a third party and suggested that they enter into an agreement whereby the third party would purchase certain items from the Supervisor and sell those items to the County for use in the Supervisor's Office. The person to whom this offer was made rejected the offer.

B. Use of public property for private purposes.

The Supervisor used office equipment, supplies and personnel to prepare and duplicate pleadings pertaining to in excess of twenty law suits he has filed regarding matters not bearing upon the functions of his office. In addition, the Supervisor has used personnel and equipment of his office in preparing pleadings relating to petitions he has filed before the Public Service Commission. In this respect, the testimony revealed that the Supervisor has copied numerous papers on the office xerox machine, and instructed employees to prepare papers relating to his private law suits and petitions before the Public Service Commission, and improperly utilized substantial hours of office time for this purpose.

C. Improper expense vouchers.

Testimony taken in this matter reveals that the Supervisor has submitted expense vouchers in his own behalf and on behalf of several of his employees for travel expenses relating to trips taken for personal purposes. These include in the main trips made for the purpose of appearing before the Public Service Commission on matters unrelated to his office.

D. Neglect of duties and absence from office.

It is the finding of this Grand Jury that the Supervisor has grossly neglected the responsibilities of his office. The testimony reveals that the Supervisor, since taking office, has devoted substantial amounts of his time to the pursuit of matters of personal interest at the expense of the voting taxpaying public. Failure to properly conduct the voter registration purge referred to above, and the failure to expeditiously complete the splitting and combining of precincts are but two examples of this neglect. The Supervisor has frequently been absent from his office for extended periods of time when the presence of the Supervisor was necessary to the efficient functioning of the office. The Grand Jury is advised that the Supervisor has not been in his office during the period of this investigation, which absence is particularly distressing in view of the two special elections which are to be held in the immediate future. News releases by the Supervisor himself indicate that his absence at this time has resulted from a deliberate attempt to avoid service of process in order for this Grand Jury to obtain his testimony.

III. Personnel and office management.

A. Hiring and firing procedures.

The Grand Jury finds that the Supervisor did, on March 27, 1970, dis-

charge from employment five permanent civil service employees with approximately fifty years combined civil service experience within the Supervisor's office. Testimony received by the Grand Jury indicates that there was no justification for such action by the Supervisor, and that said permanent civil service employees had exhibited exemplary conduct, diligence and work practices in the office.

In considering applicants for employment in the Office of the Supervisor, the Supervisor utilizes an unorthodox and inefficient system, if any system it may be called. Apparently no objective standards exist in determining the suitability for employment of any applicant. From the evidence, it appears that the Supervisor on several occasions has taken into the employ of his office persons with known and in some cases notorious criminal records.

The evidence has revealed that in at least one instance, a temporary employee was virtually hired off the street by the Supervisor when said employee had not submitted an application for employment. On said occasion, the employee had entered the Office of the Supervisor in order to register to vote. While in the office, the employee was advised that part-time temporary positions were open and was later hired at the instance of the Supervisor.

B. Improper utilization of employees.

The Grand Jury finds that the Supervisor has placed part or full-time temporary employees with three to four days experience in supervisory capacities over long-time civil service employees. This practice has lead [sic] to gross inefficiency and confusion in office organization and policy.

At the instance of the Supervisor, several of the employees of his office have accompanied the Supervisor on trips to various cities within the State to attend Public Utility hearings. Said trips were taken during office working hours, but had no relation to the official functions of the office. The Supervisor and the employees were paid expenses for said trips as a result of vouchers filed at the instance of the Supervisor.

The Supervisor used County employees in preparing private law suits not in any way connected with the Office of Supervisor. Further, the Supervisor, during the year 1969, assigned his employees to tasks such as moving furniture, making posters, relabeling precincts books already labeled, and writing papers on subjects such as smoking, health, utilities, and other subjects bearing no relation to official duties.

The Grand Jury finds that included among the temporary employees are persons who have been suspended from the practice of law, and one such person in the past has a long record of serious criminal offenses and has been repeatedly declared mentally incompetent. These employees with legal backgrounds were specifically used in preparing law suits in which the Supervisor was involved but which did not deal with any of the functions of his office.

C. Drunkenness and misconduct.

The Grand Jury finds that the Supervisor allowed the consumption of alcoholic beverages in the office during working hours. On more than one occasion, a temporary employee was seen intoxicated in the office during working hours. Testimony was presented by employees of the office of Supervisor and by Courthouse maintenance employees that wine and liquor bottles and beer cans were found in various places about the office.

The Supervisor permitted advances to be made upon one of his permanent civil service employees by a temporary employee who was under the influence of alcohol. The temporary employee involved was referred to above as having a lengthy record of criminal activity, drunkenness and incompetency. When requested by the permanent civ-

il service employee to take preventative measures against future assaults of the kind, the Supervisor vociferously criticized the permanent employee and remonstrated against her for "making trouble" for the Supervisor.

The Supervisor's treatment of voters entering the office to register, or calling over the telephone, also evidenced instances of verbal abuse. The Supervisor commonly referred to voters as "suckers" and "fools."

On the occasion of the discharge of the five permanent civil service employees, the Supervisor engaged in severe abusive and degrading criticism of these employees in the presence of the news media, approximately thirty office employees, and the public.

D. Payroll and salaries.

It appears from the testimony that the Supervisor engaged in arbitrary assignment of salaries and wages to the various employees. The system of keeping the time that each employee worked was both haphazard and inefficient. There was no sign-in or sign-out system utilized in the office, and the evidence shows that there were temporary employees working irregular hours with no means of accurately calculating the number of hours. Each person was individually responsible for reporting his hours to the timekeeper.

Service Board for certain permanent civil service employees, after requests had been made by said employees to the Supervisor and rejected by him. Following civil service approval, these raises were never forwarded to said employees by the Supervisor.

E. Purchasing procedures.

The Supervisor engaged in purchasing practices that were contrary to the policies utilized by Hillsborough County in that he would make large purchases prior to sending a requisition to the purchasing department. County officials attempted to instruct the Supervisor with regard to the proper method of purchasing. But these officials were subjected to verbal abuse and the Supervisor failed to heed their advice.

When criticized for irregular purchasing practices, the Supervisor would commonly retort that he was "saving the taxpayers money." The evidence before the Grand Jury indicates that the purchasing practices by the Supervisor amounted to false economy. In one instance, five used manual typewriters were requisitioned by the Supervisor for a purchase of approximately $100.00 each. Testimony reveals that brand new typewriters could have been purchased for approximately $125.00, accompanied by service contracts with the vendor.

F. Security, safety and sanitation practices.

Testimony reveals that the Supervisor consistently refused to cooperate with building maintenance and security officers with respect to adequate security, safety and sanitation measures. The Supervisor permitted employees to sleep overnight in the office and to use the office for purposes of personal hygiene.

After having his request to the building maintenance department for telephone extension cord refused, the Supervisor had a hole cut in a fire retaining door and installed his own extension cord. The Supervisor had closed his office door to the public and posted signs requiring the public to enter through the door of the Elections Board Office. This measure has caused confusion among people attempting to enter the Supervisor's Office, and generally limits the access of the public to the office.

The Supervisor has further refused to cooperate with building security personnel by leaving doors leading directly to the outside propped open during hours when the Courthouse is normally closed. The Supervisor has consistently refused requests from build-

ing security personnel to cease this practice.

G. General office inefficiency.

The Grand Jury has heard testimony relating almost interminable details regarding the inefficient manner in which the Supervisor's Office is now conducted. An office that previously functioned with six full-time civil servants now has no permanent civil service employees, but 35 part-time and temporary employees. However well-meaning, these employees, without adequate supervision and training, cannot function efficiently.

The overcrowding of the office, lack of organization of official records and documents, insufficient delineation of authority, and general office mismanagement all work to the detriment of the office operation and of the morale of the workers. Employees are constantly reassigned from one office function to another without having been allowed sufficient time to receive training and gain familiarity with any certain function of the office.

## CONCLUSIONS

In view of the aforementioned allegations and findings of fact, this Grand Jury makes the following conclusions:

I. That the conduct of the Supervisor of Elections of Hillsborough County, Florida, constitutes malfeasance, misfeasance and neglect of duty respecting the operation of his office under the election laws of the State of Florida.

II. That the conduct of the Supervisor of Elections of Hillsborough County, Florida, constitutes malfeasance, malpractice and neglect of duty under those laws regulating the conduct of public officers of the State of Florida.

III. That the Supervisor of Elections of Hillsborough County, Florida, has demonstrated utter disregard for proper, efficient and reasonable office personnel policies and office management

practices and has displayed conduct constituting neglect of duty, incompetence and inability to perform his official duties.

IV. That this Grand Jury has serious reservations regarding the prospect of the special election slated to be held in the near future. As a result of the current situation within the Office of the Supervisor of Elections of Hillsborough County, Florida, there is no assurance that the right to franchise of the voters of Hillsborough County will be protected.

## RECOMMENDATIONS

Having fully reported its investigation of the allegations contained herein, we, the members of the Grand Jury of Hillsborough County, Florida, hereby make the following recommendations:

I. That the Governor of the State of Florida exercise his authority under Article IV, Section 7, of the Constitution of the State of Florida, and related statutes, to suspend the Supervisor of Elections of Hillsborough County and to appoint a qualified person to fill the office so vacated until such time as the Senate of the State of Florida can act upon the suspension.

II. That consideration be given to the initiation of a new voter roll purge or, in the alternative, that county-wide reregistration be undertaken as soon as practicable.

III. That the five civil service employees that were discharged by the Supervisor of Elections on March 27, 1970, be given maximum consideration for reinstatement as civil service employees by the Civil Service Board of Hillsborough County.

IV. That full cooperation and coordination be established in the future among all county offices and the Civil Service Board of Hillsborough County to the end that qualified, efficient and able personnel be provided.

V. That despite the gravity of the improprieties reported herein, the re-

turn of criminal indictments is not warranted provided that the above recommendations are carried out.

VI. That the State Attorney is requested to prepare on behalf of this Grand Jury a letter to the appropriate authorities setting forth the recommendations of this Grand Jury, and appending thereto a copy of this Report.