IN THE MATTER OF DEL RIO

Docket No. 58716. Argued June 9, 1977 (Calendar No. 17).—Decided July 29, 1977. Appeal dismissed by the Supreme Court of the United States January 16, 1978.

The Judicial Tenure Commission recommended that the Supreme Court remove from judicial office James Del Rio, a judge of the Recorder's Court of Detroit, and permanently enjoin him from holding any judicial office. Respondent appeals. *Held:*

1. The respondent's claim that he was denied due process by the announcement that he was under investigation has no merit. It is appropriate for the Judicial Tenure Commission to determine in good faith and after careful consideration that the public interest requires a limited statement before filing a formal complaint announcing an investigation is pending against a judge in matters such as this where publicized conduct of a questionable nature by a judge causes public and media rumor to reach a substantial level. In the final analysis, the Court has the duty to render a *de novo* review on matters of record only, unswayed by public clamor.

2. Respondent's interim suspension ordered by the Court with salary pending the outcome of the Judicial Tenure Commission's investigation of him did not deny him liberty and property without due process of law. The United States Constitution does not guarantee the respondent either the right or privilege to run for or retain state elective judicial office. The state, which creates the judicial office, can set appropriate standards

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 8–11] 46 Am Jur 2d, Judges §§ 18–20.
[3, 21, 23] 46 Am Jur 2d, Judges § 7 *et seq.*
[4] 16 Am Jur 2d, Constitutional Law § 545 *et seq.*
[5, 6] 46 Am Jur 2d, Judges § 20.
[7] 16 Am Jur 2d, Constitutional Law § 548.
[12] 21 Am Jur 2d, Criminal Law §§ 303, 527 (supp).
[13] 46 Am Jur 2d, Judges § 169.
[14] 21 Am Jur 2d, Criminal Law § 538.
[15] 21 Am Jur 2d, Criminal Law §§ 495, 496
[16–19] 46 Am Jur 2d, Judges § 179.
[20] 8 Am Jur 2d, Bail and Recognizance § 166.
[22] 17 Am Jur 2d, Contempt § 13 *et seq.*

of conduct for the judge who holds that office. The eradication of corrupt practices in the state judiciary is such an important responsibility that the suspension of a judge prior to a hearing can be justified as outweighing any individual interest in a pre-suspension hearing consonant with due process. The Supreme Court has twice considered and rejected the respondent's contention that his interim suspension should be vacated. The issue has become moot because the interim suspension will be terminated upon issuance of the opinion in this matter and effective relief could not be granted.

3. Although the Judicial Tenure Commission and the master had the authority to deny all pre-complaint and prehearing discovery for reasons of confidentiality, the record shows that the master and the Supreme Court granted the respondent discovery opportunities throughout the proceedings. The Court can only conclude that it was by choice that the respondent sparingly used some of the discovery opportunities.

4. In the case at bar, the respondent fails to document the charge that the combination of the investigative and adjudicative functions in the Judicial Tenure Commission creates any risks of actual bias or prejudgment, but he simply asserts that the bias is "inherent" in the process. The Supreme Court alone decides what, if any, disciplinary action should be taken against any elected member of the state judiciary. The Judicial Tenure Commission's role is specifically limited to submitting its recommendations to the Court. The Court has made a conscious effort to segregate within the commission the investigative and adjudicative functions and does not believe that the combination of the roles in the Judicial Tenure Commission creates even a risk that due process guarantees could be violated.

5. Proofs sufficient to sustain disciplinary action have been found on the whole record independently reviewed arising from paragraphs 4–6, 8–11, 13–16, 18–23 of the complaint and the allegations of the amended complaint. The assertions of misconduct in paragraphs 3, 7, 12, 17, and 24 offer insufficient foundation for discipline. The four general categories of misconduct committed by the respondent are: disregarding statutes, court rules and canons of judicial ethics in the administration of justice; improper use of a judicial office to benefit friends; conduct giving rise to the appearance and substance of impropriety and partiality; and gross lack of judicial temperament. The cumulative effect of all such conduct constitutes misconduct in office and is conduct clearly prejudicial to the administration of justice.

6. It is important not only that the integrity of the judiciary be maintained but that the appearance of integrity be maintained. The respondent has seen fit to flout the office which was entrusted to his stewardship by the public. It is ordered that he shall not sit as a judge in a state court until five years from the date of this decision. The order shall apply regardless of his possible re-election to his present judicial office or election or appointment to any other state judicial office.

Justice Williams added that he concurred with the Court's analysis and that he concurred with the result because he believes that the power to remove extends only to the existing term of office then held.

Justice Ryan concurred in the conclusion that the respondent is guilty of misconduct in office and of conduct clearly prejudicial to the administration of justice, but would adopt the recommendation of the Judicial Tenure Commission that he be removed from office and would enjoin him from serving in any state judicial office in the future.

1. JUDGES—JUDICIAL TENURE COMMISSION—PENDING INVESTIGATION—PUBLIC STATEMENT.

It is appropriate for the Judicial Tenure Commission to determine in good faith and after careful consideration that the public interest requires a limited statement before filing a formal complaint announcing that an investigation is pending against a judge where publicized conduct of a questionable nature by a judge causes public and media rumor to reach a substantial level (GCR 1963, 932.22[a]).

2. JUDGES—JUDICIAL TENURE COMMISSION—PENDING INVESTIGATION—PUBLIC STATEMENT—DUE PROCESS.

The Supreme Court has the duty to render a *de novo* review of recommendations of the Judicial Tenure Commission on matters of record only, unswayed by public clamor; therefore a claim by a respondent judge that he was denied due process by the announcement that he was under investigation before a formal complaint was filed has no merit (GCR 1963, 932.22[a]).

3. JUDGES—CONSTITUTIONAL LAW—ELECTIVE OFFICE—DUE PROCESS—STATES.

The United States Constitution does not guarantee a judge either the right or privilege to run for or retain state elective judicial office; the state, which creates the judicial office, can set appropriate standards of conduct for the judge who holds that office.

4. Constitutional Law—Due Process.

Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances; due process is flexible and calls for such procedural protections as the particular situation demands.

5. Judges—Misconduct—Interim Suspension—Due Process.

Temporarily relieving a judge charged with misconduct from his duties and subsequently affording him a full opportunity to be heard does not offend the due process clause of the Constitution because his right to hold office is subject to the Constitution and court rule (Const 1963, art 1, § 17; art 6, § 30; GCR 1963, 932).

6. Judges—Misconduct—Interim Suspension—Due Process.

The eradication of corrupt practices in the state judiciary is such an important responsibility that the suspension of a judge prior to a hearing can be justified as consonant with due process (Const 1963, art 1, § 17; art 6, § 30; GCR 1963, 932).

7. Constitutional Law—Due Process.

One's good name and reputation alone, apart from some more tangible interest such as employment, do not implicate any liberty or property interests sufficient to invoke the procedural protection of the due process clause.

8. Judges—Judicial Tenure Commission—Discovery.

The Judicial Tenure Commission and its masters have the authority to deny all pre-complaint and prehearing disclosure and discovery in judicial fitness proceedings to protect the confidentiality of complaints made to the commission (GCR 1963, 932.13).

9. Judges—Discipline—Judicial Tenure Commission.

The Supreme Court alone decides what, if any, disciplinary action shall be taken against any elected member of the state judiciary; the role of the Judicial Tenure Commission is specifically limited to submitting its recommendations to the Court (GCR 1963, 932.25).

10. Judges—Judicial Tenure Commission—Due Process.

The combination of the investigative and adjudicative roles in the Judicial Tenure Commission does not result in a violation of procedural due process; the Supreme Court has made a conscious effort to segregate within the commission the investigative and adjudicative functions by requiring that an independent master be appointed by the Court to preside over the

adjudicative process once the commission files a formal complaint and that the master make findings of fact and conclusions of law upon which the commission makes its recommendation and upon which the Court ultimately bases its decision (GCR 1963, 932.10).

11. JUDGES—JUDICIAL TENURE COMMISSION—APPEAL AND ERROR.

The Supreme Court in considering a recommendation of the Judicial Tenure Commission reviews the record *de novo* and considers all the circumstances to determine whether the conduct complained of constitutes misconduct in office or conduct that is clearly prejudicial to the administration of justice (GCR 1963, 932.25).

12. CRIMINAL LAW—SENTENCING—COURTS—JUDGES—PRESENTENCE REPORTS.

A presentence report is required upon conviction of a felony where an indeterminate sentence is to be imposed; in view of the importance of these reports to the defendant, society and the administration of justice, obtaining and reviewing such reports may not be disregarded by a trial court (MCL 771.14; MSA 28.1144; RCR 29).

13. JUDGES—BENCH TRIAL.

A court is duty-bound during a bench trial not to form or express an opinion on the merits of a case until it is submitted for determination (MCL 763.4; MSA 28.857; GCR 1963, 515.1).

14. ROBBERY—ARMED ROBBERY—SENTENCE.

A finding by a trial judge that a defendant was guilty of armed robbery legally obligated the judge to sentence the defendant to imprisonment for a term of years or for life; the court cannot impose probation upon conviction of an armed robbery charge (MCL 771.1; MSA 28.1131).

15. JUDGES—MISCONDUCT—PLEAS OF GUILTY.

A trial judge was guilty of judicial misconduct in improperly handling pleas of guilty where the record shows that the judge coerced pleas of guilty with the threat of imprisonment coupled with a promise of leniency if a defendant would plead guilty, attempted to intimidate a lawyer into surrendering a motion upon which his client's appellate right rested, accepted pleas of guilty over objections of the prosecution, interjected extraneous matters into the trial process, appeared to grant probation solely because the defendant made a plea, and often interfered with the attorney-client relationship (GCR 1963, 785.7).

16. JUDGES—MISCONDUCT—PREJUDICE.

An extraordinary effort on behalf of a trial judge to assist a female complainant who was a friend to obtain a warrant on a charge of aggravated assault and to conduct an arraignment after normal court hours reflected clear prejudice against the defendant and open disregard for the rule of judicial impartiality and violated the Canons of Judicial Ethics (Canons of Judicial Ethics, Canons 4, 5, 13; Code of Judicial Conduct, Canons 1, 2).

17. JUDGES—MISCONDUCT—"TICKET-FIXING".

A request by a judge in chambers that a police commander cancel a moving violation traffic ticket given to a friend of the judge who was driving the judge's car in which he was a passenger constituted "ticket-fixing" which is in clear violation of the Code of Judicial Conduct as the use of the judge's office and its prestige to benefit friends (Code of Judicial Conduct, Canons 1, 2).

18. JUDGES—MISCONDUCT.

A trial judge who took jurisdiction without permission of a misdemeanor charge against an acquaintance which was assigned to another judge, advanced the trial date with little notice to either counsel and at the request of neither, proceeded with the trial over the objection of defense counsel and then prepared a rare written opinion dismissing the charge improperly used the judge's office to benefit his acquaintance, a violation of the Code of Judicial Conduct (Code of Judicial Conduct, Canons 1, 2).

19. JUDGES—MISCONDUCT—PARTIALITY—IMPROPRIETY.

Misconduct by a judge gave rise to both the appearance and substance of impropriety and partiality where the judge had *ex parte* communications with a complaining witness just before a bench trial, was improperly involved in the case assignment in order to transfer a specific case in which the judge had some interest, and expressed his opinion that a particular defendant was guilty before the bench trial occurred (Code of Judicial Conduct, Canons 1, 2).

20. JUDGES—MISCONDUCT—BAIL BONDS—REMISSION.

The issuing of *ex parte* orders by a Recorder's Court Judge remitting forfeited bail bonds to professional bondsmen in cases which were still under the jurisdiction of other judges, without notice to the prosecuting attorney or to counsel for the county, in proceedings conducted on weekends when court was not

normally in session, and concerning forfeitures made in most of the cases five or more years before the orders, was clearly partial and improper (MCL 726.2; MSA 27.3552; GCR 1963, 772.4, RCR 16, § 11; RCR 18, §§ 2, 3; Canons of Judicial Ethics, Canons 4, 5, 13, 16; Code of Judicial Conduct, Canons 1, 2).

21. JUDGES—MISCONDUCT—JUDICIAL TEMPERAMENT.

Proper judicial temperament is an essential ingredient in the dispensation and administration of justice; it is displayed when a judge discharges his duties in a professional manner with patience, courtesy and dignity.

22. JUDGES—MISCONDUCT—CONTEMPT.

The failure of a judge to use the ultimate power of contempt with restraint in order to maintain decorum reflects conduct unbecoming a judicial officer.

23. JUDGES—MISCONDUCT.

It is important not only that the integrity of the judiciary be preserved but that the appearance of that integrity be maintained.

*Joseph F. Regnier,* Executive Director & General Counsel *(Neal W. Bauer, Stanley T. Dobry,* and *Thomas L. Prowse,* Staff Attornies, of counsel) for the Judicial Tenure Commission.

*Elbert L. Hatchett* for respondent.

Amicus Curiae:

Wolverine Bar Association, by *Willa Mae King,* President.

PER CURIAM. The Judicial Tenure Commission[1]

[1] Const 1963, art 6, § 30, which established the Judicial Tenure Commission in 1968, provides:

"(1) A judicial tenure commission is established consisting of nine persons selected for three-year terms as follows: Four members shall be judges elected by the judges of the courts in which they serve; one shall be a court of appeals judge, one a circuit judge, one a probate judge and one a judge of a court of limited jurisdiction. Three shall be members of the state bar who shall be elected by the members of the state bar of whom one shall be a judge and two shall not be judges. Two shall be appointed by the governor; the members appointed by

(hereinafter the Commission) has recommended that this Court remove from judicial office the Honorable James Del Rio, Detroit Recorder's Court Judge, and permanently enjoin him from holding any judicial office in the future. Pursuant to GCR 1963, 932.24, the respondent petitioned this Court to reject or modify the Commission's recommendation. We have reviewed the record *de novo*.[2] We deny the Commission's recommendation that Judge Del Rio be permanently removed from office, but we conclude that he should be suspended from office for a period of five years without salary.[3] This order shall apply regardless of respondent's possible intervening re-election to office or election to any other state court.[4]

## Issues

I. Was the respondent denied due process and thus irreparably injured by the Judicial Tenure

the governor shall not be judges, retired judges or members of the state bar. Terms shall be staggered as provided by rule of the supreme court. Vacancies shall be filled by the appointing power.

"(2) On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice. The supreme court shall make rules implementing this section and providing for confidentiality and privilege of proceedings."

[2] *In re Somers,* 384 Mich 320, 323; 182 NW2d 341 (1971).

[3] Judge Del Rio is suspended for the final 17 months of his present term which expires January 1, 1979. Should he be re-elected to a subsequent term he is suspended for the first 43 months of that term. In effect then Judge Del Rio cannot sit as a judge by election or appointment until July of 1982. During this period he cannot receive any judicial salary.

[4] There is ample precedent for suspending a judge beyond his present term of office. *See, In the Matter of Mikesell,* 396 Mich 517; 243 NW2d 86 (1976). *Also see; State ex rel Williams v Haworth,* 551 P2d 676, 679 (Okla Ct on Judiciary, App Div, 1976). *See generally,* Anno: *Power of Court to Remove or Suspend Judge,* 53 ALR3d 882.

Commission's public announcement, pursuant to GCR 1963, 932.22, that the respondent was under investigation even though no formal complaint had been filed?

II. Was the respondent denied liberty and property without due process of law when this Court ordered, pursuant to GCR 1963, 932.20, his interim suspension with salary pending the outcome of the Judicial Tenure Commission's investigation of him?

III. Were the respondent's due process rights violated because he was substantially denied pre-complaint, prehearing and hearing discovery?

IV. Do the combined investigative, adjudicative and disciplinary roles of the Judicial Tenure Commission violate the respondent's constitutional right to due process?

V. Does a *de novo* review of the record support the Judicial Tenure Commission's recommendation that the respondent be disciplined for "misconduct in office" or "conduct clearly prejudicial to the administration of justice"?

## HISTORY

The respondent, Judge James Del Rio, was elected to the office of Judge of the Detroit Recorder's Court in November, 1972, and took office on January 1, 1973. His term of office expires on January 1, 1979.

On February 25, 1976, the Judicial Tenure Commission sent Judge Del Rio a "15-day letter", as required by GCR 1963, 932.7(b), outlining numerous allegations of judicial misconduct. The Commission requested that Judge Del Rio respond within 15 days.

On March 10, 1976, Judge Del Rio's attorney

wrote to the Commission requesting an extension of time to April 12, 1976, within which to reply to the Commission's letter of February 25, 1976.

On March 10, 1976, the Commission extended the time for Judge Del Rio's response until the close of business on April 5, 1976.

On March 30, 1976, a letter signed by three attorneys representing Judge Del Rio requested an additional but unspecified extension of time for response.

On April 1, 1976, the Commission extended the time for Judge Del Rio's response until 12 o'clock noon on April 12, 1976, per the respondent's original request.

On April 9, 1976, Judge Del Rio filed a "John Doe" complaint in this Court for an order of superintending control seeking, *inter alia,* a more specific statement of the allegations of judicial misconduct, an extension of time to present his response and suppression of the file.

On April 16, 1976, the Commission filed its response in this Court to the "John Doe" complaint filed by Judge Del Rio. On the same day respondent also filed a supplemental brief in support of his complaint for superintending control.

Meanwhile, on April 15, 1976, this Court issued an order granting immediate consideration of respondent's motion for superintending control and denied it for lack of merit. A motion to suppress the file was also considered and granted as to the Exhibits A–G.

Later the same day the foregoing order was vacated by this Court. Instead, on April 20, 1976, this Court issued another order. That order granted the motion for immediate consideration; extended respondent's time for filing a response under GCR 1963, 932.7(b), until 4:30 p.m., July 1,

1976; ordered the Commission to state with more specificity the charges contained in paragraphs 15, 16 and 17 of the 15-day letter of February 25, 1976; and ordered the Commission to make available to respondent any Recorder's Court transcript already prepared and within the Commission's possession.

Pursuant to the Supreme Court's order of April 20, 1976, the Commission, on April 30, 1976, sent a letter to respondent which more specifically set forth the nature of the allegations in paragraphs 15, 16 and 17 of the original 15-day letter. That response included numerous exhibits consisting of letters, transcripts, affidavits, testimonials and other materials.

Thereafter, on July 30, 1976, the Commission filed its Formal Complaint No. 18 against respondent incorporating, with few exceptions, the charges set forth in its letter of February 25, 1976.

On August 2, 1976, the Commission petitioned this Court for the interim suspension of Judge Del Rio pursuant to GCR 1963, 932.20.

On August 10, 1976, respondent's attorneys filed his response in this Court to the Commission's petition for interim suspension. That response included a 30-page brief addressing the substance of Formal Complaint No. 18 as well as the question of whether due process would be denied by interim suspension.

Also on August 10, 1976, respondent filed an "omnibus motion" in the Supreme Court seeking a preliminary hearing, an evidentiary hearing or a dismissal as well as certain other relief.

On August 17, 1976, respondent filed an answer, affirmative and special defenses with the Commission.

On August 20, 1976, the Commission petitioned

this Court for the appointment of a Master to conduct hearings in the matter of Formal Complaint No. 18 pursuant to GCR 1963, 932.10(b).

On the same date the Commission also filed its response to Judge Del Rio's omnibus motion.

On August 30, 1976, this Court acted on the Commission's request for the appointment of a Master by designating TIMOTHY C. QUINN, Judge of the Court of Appeals, as Master to consider Formal Complaint No. 18.

On September 7, 1976, a prehearing conference was held in Lansing. That meeting was attended by the Master, the Executive Director and General Counsel of the Judicial Tenure Commission, the Commission's Special Examiner, and the attorneys representing Judge Del Rio.

Following this prehearing conference, Judge QUINN issued an order stating that all motions should be made before September 14, 1976, and responses thereto should be made before September 17, 1976. A hearing on all motions was scheduled for September 21, 1976, and the hearing on Formal Complaint No. 18 was scheduled to begin on September 28, 1976.

On September 7, 1976, this Court also ordered Judge Del Rio to refrain from acting as a judge pending final adjudication of Formal Complaint No. 18. This Court further denied the "omnibus motion" and denied the motion to dismiss without prejudice to the raising of appropriate prehearing motions before the Master.

On September 14, 1976, Judge Del Rio filed a motion with the Master for an omnibus prehearing conference and also filed an omnibus motion for a preliminary hearing and certain other relief identical to that requested in this Court on August 10, 1976.

Also, on September 14, 1976, respondent filed a motion to correct omissions and supplement the record to include as a part of the answer to Formal Complaint No. 18 materials which had theretofore been filed in response to the "15-day letter" of February 25, 1976.

On September 14, 1976, one of Judge Del Rio's attorneys requested an adjournment of the Formal Complaint hearing scheduled to begin on September 28, 1976, on the grounds that he expected to be in trial on that date.

On September 14, 1976, the Commission filed its response in opposition to the motion to adjourn the hearing.

On September 17, 1976, the Commission filed its response to Judge Del Rio's omnibus motion.

On September 20, 1976, Judge Del Rio's attorneys filed a motion in this Court for rehearing on the interim suspension together with a brief in support thereof.

On September 21, 1976, a hearing was held before Judge QUINN to consider all pending motions in the matter of Formal Complaint No. 18. Subsequently an order was entered by Judge QUINN denying all motions theretofore filed.

On September 24, 1976, the Commission filed its response in this Court to Judge Del Rio's motion for rehearing of the interim suspension.

On September 27, 1976, Judge Del Rio once again filed a complaint for superintending control and a motion for immediate consideration in this Court with particular reference to Judge QUINN's order denying respondent's motion for adjournment. The Commission responded to this complaint on October 1, 1976.

On September 28, 1976, the hearing on the matter of Formal Complaint No. 18 commenced

before Judge QUINN. On that date, Judge Del Rio did not appear because he was "suffering from a cardiac deficiency in part and some gastric problem * * * ".

The Master then proceeded to take a portion of the direct examination of the Commission's first witnesses but shortly thereafter adjourned the matter until the following day for the presentation of medical evidence concerning Judge Del Rio's condition.

On September 29, 1976, the Master heard testimony from medical witnesses for the respondent and for the Commission concerning the urological complaint of the respondent. At the close of this testimony, the Master concluded that the presence of Judge Del Rio would not be so seriously injurious to his health as to justify adjournment. Thereafter, however, the Master did grant an adjournment until Tuesday, October 5, 1976; respondent's attorneys promised that respondent would be present at that time.

Meanwhile, on October 1, 1976, this Court issued its order denying the respondent's motion for superintending control in the matter of the Master's denial of respondent's motion for adjournment.

The hearing before the Master resumed on October 5, 1976, and, at that time, both respondent and his attorney were present. The hearing on the Formal Complaint took 14 days. Seventy-three witnesses testified (66 for the Commission and 7 for the respondent) and 128 exhibits were offered (95 by the Commission and 33 by the respondent). Two thousand, four hundred pages of transcript were taken.

On October 6, 1976, the Master issued an order allowing an amendment of Formal Complaint No. 18 by the Commission to include certain allega-

tions concerning return of bond forfeitures and providing, further, that no testimony should be offered relative to the amendment until October 20, 1976, in order to give respondent a reasonable opportunity to answer the amendment and prepare his defense.

On October 20, 1976, respondent filed his answer to the amendment to Formal Complaint No. 18.

At the conclusion of the hearing on November 10, 1976, both sides agreed to present written closing arguments for the consideration of the Master. The Commission submitted its argument on December 3, 1976, while the respondent's argument was submitted on December 31, 1976.

In the meantime, this Court issued another order on January 6, 1977, denying respondent's motion for reconsideration of his interim suspension.

On January 18, 1977, the Master submitted his report to the Commission containing his findings of fact and conclusions of law.

Also on January 18, 1977, the Commission ordered a hearing to be held on February 9, 1977, to consider objections by the examiner and by the respondent to the report of the Master pursuant to GCR 1963, 932.16 and 932.17.

On February 28, 1977, the Commission affirmed the Master's findings and, in a 29-page opinion, submitted its recommendation to this Court that Judge Del Rio be removed from office, that further payment of his judicial salary be suspended and that he be enjoined from holding judicial office in the future.

On March 2 and 3, 1977, the Commission certified the record of proceedings in the matter of Formal Complaint No. 18 to this Court and filed its opinion and recommendation in the matter as

well as a motion for termination of judicial compensation.

On March 28, 1977, respondent filed a motion for extension of time in which to submit his brief to the Supreme Court and on that same date this Court issued an order granting the respondent until May 12, 1977, to file his brief.

On May 9, 1977, the Supreme Court denied the Commission's motion for termination of respondent's judicial salary.

On May 13, respondent Del Rio's objections to the Commission's recommendation were filed with this Court.

This Court heard oral arguments in this matter on June 9, 1977.

I

The respondent initially claims that he was denied due process and thus irreparably injured by the Judicial Tenure Commission's public announcement, pursuant to GCR 1963, 932.22(a), that he was under investigation even though no formal complaint had been filed.

On Thursday, June 12, 1975, the Judicial Tenure Commission publicly announced that there was an investigation pending as to Detroit Recorder's Court Judge James Del Rio. This announcement occurred six months before the Commission gave written notice to the respondent regarding the nature of the charges. The respondent claims that he was irreparably injured by this disclosure. He asserts it served as an open invitation for the filing of complaints and created an aura of guilt through media reports and commentary. We decline to find that such statement irreparably in-

jured respondent's case before the Master, the Commission or this Court.

The provisions of GCR 1963, 932.22(a) grant to the Commission the power to make such announcement. It states:

"Prior to the filing of a complaint, no member of the commission or its staff shall disclose the existence or contents of the investigation nor any testimony taken nor papers filed therein; provided, however, that the commission may at any time make public statements as to matters pending before it, only upon its determination by a majority vote that it is in the public interest to do so, limited to the following: (1) that there is an investigation pending, or (2) that the investigation is complete and that there is insufficient evidence for filing a complaint by the commission."

No evidence has been presented to this Court which leads us to any other conclusion than that the action of the Commission in this case strictly complied with the rule. The public statement went no further than announcing an investigation was pending.

Before such announcement could have been made a majority of the members of the Commission must have determined that it was in the public interest to do so. A weighing of equities was required.

It is recognized that some disadvantage could inure to the respondent by such action if no formal complaint were ever issued. On the other hand, the statement provided prior notice to the respondent that he was under investigation. Thus it afforded him the opportunity to clarify misconceptions and to rectify his conduct. Also, it clarified unwarranted rumors and assuaged public speculation.

In a matter such as this, where publicized conduct of a questionable nature by a member of the judiciary causes public and media rumor to reach a substantial level, we conclude it is appropriate for the Commission to determine in good faith and after careful consideration that the public interest requires issuance of a limited statement as provided by the rule.

In the final analysis, this seven-person Court has the duty to render a *de novo* review on matters of record only. It is our clear responsibility to be unswayed by public clamor. Respondent's contention has no merit.

## II

Respondent maintains that, under both the Federal and state Constitutions, he was denied liberty and property without due process of law when this Court ordered, pursuant to GCR 1963, 932.20,[5] his interim suspension with salary pending the outcome of the Commission's investigation of him. We do not agree for three reasons.

First (1), it is a well established rule of law that the United States Constitution does not guarantee the respondent either the right or privilege to run for or retain *state* elective judicial office. See, *inter alia, Gruenburg v Kavanagh,* 413 F Supp 1132 (ED Mich, 1976); *Snowden v Hughes,* 321 US 1; 64 S Ct 397; 88 L Ed 497 (1944); *Peterson v Knutson,* 367 F Supp 515 (D Minn, 1973), and the cases cited therein.

Respondent's right to hold state elective judicial office derives from *state* constitutional and statutory provisions. See MCLA 600.223; MSA 27A.223.

---

[5] "Upon notice to respondent, the commission may petition to the Supreme Court for an order suspending a judge from acting as a judge pending final adjudication of a pending complaint."

The state, which creates the judicial office, can set appropriate standards of conduct for the judge who holds that office. There is no Federal constitutional stricture that this Court is aware of which mandates that a state must permit a judge to hold judicial office unhampered by appropriate standards of judicial conduct. See, *Gruenburg, supra,* 1135.

Second (2), we cannot agree that this Court's decision, upon the Commission's recommendation, to order an interim suspension deprived the respondent of "liberty" or "property" contrary to state constitutional guarantees of due process. Nor do we agree that our court rules deny due process of law to persons holding judicial office.

"[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Joint Anti-Fascist Refugee Committee v McGrath,* 341 US 123, 162; 71 S Ct 624; 95 L Ed 817 (1951) (Frankfurter, J., concurring). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v Brewer,* 408 US 471, 481; 92 S Ct 2593; 33 L Ed 2d 484 (1972).

GCR 1963, 932, provides a full panoply of procedural guarantees for adjudicating allegations of judicial misconduct. In respondent's case, the order for interim suspension was not entered until the respondent was given adequate notice and a reasonable opportunity to respond to both the complaint and the petition for interim suspension.

Respondent was afforded full opportunity to be represented by counsel, to examine and cross-examine witnesses, to present evidence, to submit briefs and to argue his case before a master (in this case, a well-respected Court of Appeals Judge).

That Master was further required to file findings of fact and conclusions of law with the Commission and those findings were then certified to this Court.

The respondent's *interim* suspension with full salary from his duties did not constitute removal from elective office. Permanent removal occurs, if at all, only after the respondent has been afforded a full and complete hearing. Furthermore, since the respondent's constitutional right to hold judicial office is subject to Const 1963, art 6, § 30, and GCR 1963, 932, relieving him temporarily from his duties and subsequently affording him a full opportunity to be heard does not offend the due process clause of our Constitution. Const 1963, art 1, § 17. Also see, *Attorney General, ex rel Rich v Jochim,* 99 Mich 358; 58 NW 611 (1894); *Detroit v Division 26 of the Amalgamated Ass'n of Street, Electric Railway & Motor Coach Employees of America,* 332 Mich 237; 51 NW2d 228 (1952).

It should not be forgotten that the eradication of corrupt practices in the state judiciary is such an important responsibility that the suspension of a judge prior to a hearing can be justified as consonant with due process. In a case such as this, the state interest in utilizing suspension to preserve the integrity of the judiciary surely outweighs any individual interest in a pre-suspension hearing. *Fair v Kirk,* 317 F Supp 12, 17 (ND Fla, 1970), *aff'd* 401 US 928; 91 S Ct 935; 28 L Ed 2d 210 (1971), *reh den,* 403 US 941 (1971).

Respondent also contends that the interim suspension without a hearing irreparably damaged his good name, reputation and opportunity to be re-elected. Respondent posits that this also constitutes a denial of liberty and property without due process of law.

The Federal court (ED Mich) recently was confronted with this very same issue in *Gruenburg, supra,* 1136–1137. That court very succinctly dismissed the issue and we agree with that court's analysis:

"Plaintiff also contends that the interim suspension without a hearing irreparably damaged his good name, reputation and opportunity to be re-elected. One's good name and reputation alone, apart from some more tangible interest such as employment, however, do not implicate any 'liberty' or 'property' interests 'sufficient to invoke the procedural protection of the Due Process Clause.' *Paul v Davis,* 424 US 693; 96 S Ct 1155, 1161; 47 L Ed 2d 405, 414 (1976). Although plaintiff's employment is arguably involved here, he will not be divested of that employment, if at all, until there has been a full hearing. Similarly, plaintiff's contention that his opportunity to be re-elected has been irreparably damaged is much too intangible an interest to invoke the protection of due process. * * * In any event, Mich Gen Ct Rule 932.20 was enacted before plaintiff was first elected and he holds office subject to the rule. *Sarisohn v Appellate Div, Second Dep't, Supreme Court of New York,* 265 F Supp 455, 459 (ED NY, 1967)." Also see *In re Huff,* 352 Mich 402; 91 NW2d 613 (1958).[6]

Finally (3), we reject as *moot* respondent's contention that his interim suspension violated state constitutional guarantees of due process.

This Court has twice considered and rejected respondent's contention that his interim suspension should be vacated. See History, *supra.* At this juncture, our Court, as required by GCR 1963, 932.25, is undertaking a *de novo* review of the record submitted by the Commission. Therefore,

---

[6] *Huff* establishes, *inter alia,* that the right of the people of a judicial circuit to the service of a judge whom they have elected is subject to express and distinct limitations and qualifications provided for by the Constitution and statutes.

respondent is assured that his interim suspension will be terminated upon the issuance of this opinion.

Hence, any further review of the interim suspension would be futile because the issue has become moot by reason of (a) a lapse of time resulting in a change of circumstances; and (b) the pragmatic consideration that effective relief could not be granted. *Cf. McCarthy v Wayne Circuit Judge,* 294 Mich 368, 373; 293 NW 683 (1940), and the cases cited therein.

### III

Respondent claims his right to due process of law was violated because he was denied pre-complaint, prehearing and hearing discovery. However, the record of the proceedings in this case does not support those allegations.

Initially, it must be remembered that technically GCR 1963, 932.13, does not allow for either pre-complaint or prehearing discovery in judicial fitness proceedings:

"Prior to filing of a complaint, the commission may take evidence before it or any individual member of the commission or its staff for purposes of its preliminary inquiry. No discovery proceedings shall be had at the request of respondent, either before or after the filing of a complaint."

In *In the Matter of Mikesell,* 396 Mich 517, 534; 243 NW2d 86 (1976), this Court addressed the policy reasons for limiting disclosure and discovery in judicial fitness proceedings:

"[T]he confidentiality provisions * * * protect witnesses and citizen complainants. If the respondent and

others similarly situated were allowed to discover the name of every complainant, including those who will not appear and those whose complaints have been dismissed, the free flow of information to the Commission would be curtailed. The Commission carefully investigates all complaints and this Court would not want to discourage citizen complainants from voicing their ideas."

Therefore, the Commission and the Master theoretically had the authority to deny all pre-complaint and prehearing discovery.[7] Those requests which were denied were denied justifiably under the rule. However, the record demonstrates that limited pre-complaint and prehearing discovery was afforded the respondent. See, History, *supra.*

The Commission's "15-day" letter of February 25, 1976, substantially set forth all the allegations which were later contained in the Commission's Formal Complaint No. 18, filed on July 30, 1976.[8] The 15-day letter listed the charges and enumerated cases, dates and a list of prospective witnesses. Furthermore, on April 20, 1976, this Court (a) granted the respondent an extension of time until July 1, 1976, to answer the 15-day letter; (b) ordered the Commission to "state with more specificity the charges contained in paragraphs 15, 16 and 17" of the 15-day letter and (c) ordered the Commission to make available to the respondent

[7] It is well settled that parties to judicial or *quasi*-judicial proceedings, including administrative proceedings, are not entitled to discovery as a matter of constitutional right. *National Labor Relations Board v Valley Mold Co, Inc,* 530 F2d 693, 695 (CA 6, 1976); *NLRB v Interboro Contractors, Inc,* 432 F2d 854, 857–858 (CA 2 1970), *cert den* 402 US 915 (1971); *Starr v Commissioner of Internal Revenue,* 226 F2d 721, 722 (CA 7, 1955), *cert den,* 350 US 993 (1956).

[8] "Before filing a complaint or recommending an order of private censure, the commission shall give written notice to the judge of the nature of the charges being made against him and he shall be afforded a reasonable opportunity to present in writing such matters as he may choose for consideration by the commission."

"transcripts of Recorder's Court proceedings already prepared, within the defendant's [Commission's] possession, and upon which the allegations of the written notice may have been based".

It is clear, therefore, that while pre-complaint discovery could have been denied for confidentiality reasons, this Court and the Commission did grant the respondent's request for limited pre-complaint discovery. It should not be overlooked that an unprecedented four-month time extension was also granted respondent to investigate and prepare his response to the 15-day letter.

The record also does not support respondent's allegation that he was denied prehearing discovery. On September 7, 1976, the Master ordered that all prehearing motions were to be filed by September 14, 1976. Respondent's motions were denied on September 21, 1976, only after his attorneys declined to present any argument in support of them.

Finally, the record does not support respondent's charge that he was denied hearing discovery. The record clearly indicates for instance that the Master granted the respondent's request to be informed as to which witnesses would be appearing on each successive day of the hearing. The Master also complied when the respondent infrequently asked that *Jencks* material as to a specific witness be provided in advance. *Jencks v United States,* 353 US 657; 77 S Ct 1007; 1 L Ed 2d 1103 (1957). Timely adjournments were also granted to allow study of the material. Our reading of the record indicates that respondent's attorneys were given every reasonable opportunity to review pertinent files and subpoena any additional information which they needed during the hearing. The hearing discovery demands of both parties were treated

similarly and evenhandedly by the Master. We can only conclude that it was by choice that respondent sparingly utilized some of the discovery opportunities granted by the Master and this Court.

The additional arguments advanced by the respondent with respect to deprivation of alleged discovery rights are of no merit.

## IV

Respondent[9] next contends that the combined investigative, adjudicative and disciplinary roles of the Judicial Tenure Commission "make it a tribunal of inherent and incurable bias" and, as such, the Commission is incapable of rendering due process.

Initially, we must make it clear that the respondent is operating under a gross misconception if he believes that the Commission exercises any *disciplinary* function. Pursuant to GCR 1963, 932.25, this Court, and this Court alone, decides what, if any, disciplinary action shall be taken against any elected member of the state judiciary:

"The Supreme Court shall review the record of the proceedings on the law and facts and shall file a written opinion judgment directing censure, removal, retirement, suspension, or other disciplinary action as it finds just and proper, or reject or modify, in whole or in part, the recommendations of the commission."

The Commission's role is specifically limited to submitting its "recommendations" to this Court. This Court exercises the disciplinary function. Our decision not to follow the Commission's recommendation as to the respondent in the instant case is

[9] The Wolverine Bar Association discusses this issue at length in its *amicus curiae* brief.

illustrative of this very fact. Also see, *In the Matter of Mikesell,* 396 Mich 517; 243 NW2d 86 (1976).

We are in limited agreement with respondent's contention that the investigative and adjudicative roles are combined in the Commission. (By "limited" agreement, we mean that it should not be forgotten that we review *de novo* the Commission's adjudication of the matter before we take disciplinary action.)

However, the authority is legion in support of the proposition that combining the investigative and adjudicative roles in a single agency does not necessarily violate due process in administrative adjudications such as judicial fitness hearings. See, *inter alia, Halleck v Berliner,* 427 F Supp 1225, 1243–1244 (DC, 1977); *Roy v Jones,* 349 F Supp 315, 322 (WD Pa, 1972), *aff'd on other grounds,* 484 F2d 96 (CA 3, 1973); *Keiser v Bell,* 332 F Supp 608, 617–619 (ED Pa, 1971); *In re Rome,* 218 Kan 198, 204–205; 542 P2d 676, 683–684 (1975); *In re Hanson,* 532 P2d 303, 306 (Alas, 1975); *In re Diener,* 268 Md 659, 677–679; 304 A2d 587 (1973), *cert den, sub nom Broccolino v Maryland Comm on Judicial Disabilities,* 415 US 989; 94 S Ct 1586; 39 L Ed 2d 885 (1974). *In re Kelly,* 238 So 2d 565 (Fla, 1970), *cert den* 401 US 962 (1971), *reh den* 403 US 940 (1971). See generally, 2 Davis, Administrative Law Treatise, §§ 13.01–13.11, pp 171–249.

In *Withrow v Larkin,* 421 US 35, 47; 95 S Ct 1456; 43 L Ed 2d 712 (1975), the United States Supreme Court stated, and we agree, that the burden is on the respondent to prove bias in such situations:

"The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication

has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."

In the case at bar, the respondent fails to document the charge that the combination of the investigative and adjudicative roles in the Commission creates any risks of actual bias or prejudgment. Respondent simply asserts that the bias is "inherent" in the process.

This Court has made a conscious effort to segregate within the Commission the investigative and adjudicative functions. We specifically require under GCR 1963, 932.10, that an independent master be appointed by this Court to preside over the adjudicative process once the Commission files a formal complaint. It is this master who also makes the findings of fact and conclusions of law upon which the Commission makes its recommendation and this Court ultimately bases its decision. Therefore, this Court, like the United States Supreme Court in *Withrow, supra,* 58, does not believe that the combination of the investigative and adjudicative roles in the Judicial Tenure Commission creates even a risk that due process guarantees could be violated.

"The initial charge or determination of probable cause and the ultimate adjudication have different bases and purposes. The fact that the same agency makes them in tandem and that they relate to the same issues does not result in a procedural due process violation. Clearly, if the initial view of the facts based on the

evidence derived from nonadversarial processes as a practical or legal matter foreclosed fair and effective consideration at a subsequent adversary hearing leading to ultimate decision, a substantial due process question would be raised. But in our view, that is not this case."

# V

*Does a* de novo *review of the record support the Judicial Tenure Commission's recommendation that the respondent be disciplined for "misconduct in office" or "conduct clearly prejudicial to the administration of justice"?*

Pursuant to Const 1963, art 6, § 30(2), this Court adopted GCR 1963, 932.4, which provides:

".4 Standards of Judicial Conduct.

"(a) A judge shall be personally responsible for his own behavior and for the proper conduct and administration of the court or tribunal in which he presides.

"(b) A judge shall be deemed guilty of misconduct in office if:

\* \* \*

"(iv) His conduct is clearly prejudicial to the administration of justice.

\* \* \*

"(d) Conduct in violation of the code of judicial conduct or code of professional responsibility and canons, whether the conduct complained of occurred before or after the respondent became a judge or was or was not connected with his judicial office, may constitute misconduct in office or conduct that is clearly prejudicial to the administration of justice or other cause delineated in Const 1963, art 6, § 30. The question in every case is whether the conduct complained of constitutes misconduct in office or conduct that is clearly prejudicial to the administration of justice or there is other cause delineated in Const 1963, art 6, § 30, not whether a particular canon or disciplinary rule has been violated.

All the circumstances are to be considered in deciding whether action by the commission is warranted."

The Honorable TIMOTHY C. QUINN, Master in this cause, determined that respondent, Judge James Del Rio, was guilty of misconduct as to nearly all the allegations charged in the Formal Complaint No. 18. He concluded:

"On this record, I conclude that Judge Del Rio:

"1. Uses his office to benefit friends and acquaintances.

"2. Sentences defendants in violation of MCLA 771.14; MSA 28.1144 and Recorder's Court Rule 29.

"3. In order to accomplish his desire to place a defendant on probation, grants a new trial following a conviction for a non-probationable offense in order to permit a defendant to plead guilty to a probationable offense.

"4. Is not impartial in conducting trials.

"5. Exercises and attempts to exercise personal judicial control over selected cases.

"6. Uses threats of imprisonment or promises of probation to induce pleas of guilty.

"7. Is discourteous and abusive to counsel, litigants, witnesses, court personnel, spectators and news reporters.

"8. Abuses the power of contempt.

"9. Brags of his sexual prowess openly.

"10. Is continually guilty of judicial misconduct that is not only prejudicial to the administration of justice but destroys respect for the office he holds."

The Commission affirmed and adopted the findings of the Master as follows:

"We adopt as fully supported by the record herein, the final conclusion of the Master when he said:

" 'In summary, Judge Del Rio has demonstrated by

his conduct that he is legally, temperamentally and morally unfit to hold any judicial position.'

"By reason of the foregoing, it is our recommendation to the Supreme Court that Judge Del Rio be removed from the office he holds as Recorder's Court Judge of the City of Detroit and further, that he be permanently enjoined from holding any judicial office."

Although he now suggests that "he has a valid defense to each and every charge brought against him", the respondent in his brief does not challenge or urge a different conclusion from the facts shown, but merely states:

"Respondent's objections to the recommendation of the Judicial Tenure Commission will not address in an adversary manner, the so-called findings of fact and conclusions of law filed herein by the master."

Moreover, the Master observed:

"There is little dispute on the facts adduced by the Commission in support of the judicial misconduct charge against Judge Del Rio. The dispute is over what those facts establish."

We have reviewed the record *de novo*.[10] We perceive the question before this Court to be "whether the conduct complained of constitutes misconduct in office or conduct that is clearly prejudicial to the administration of justice." "All the circumstances are to be considered * * * ."

In order to deal with the numerous allegations of substantive misconduct, we have divided our analysis into four general categories. Pertinent examples will be reviewed relating to each category of alleged misconduct. Some occurrences will

[10] *In re Somers, supra;* GCR 1963, 932.25.

overlap categories. We make no attempt here to enumerate and discuss in this opinion every example of misconduct or any incident that offers no basis for disciplinary action. Our conclusion, however, is based on the whole record independently reviewed. As reflected herein, we find proofs sufficient to sustain disciplinary action arising from paragraphs 4 through 6, 8 through 11, 13 through 16, 18 through 23 and the allegations of the amended complaint. The assertions of misconduct in 3, 7, 12, 17 and 24 offer insufficient foundation for discipline.

The four general categories of misconduct are:

1. Disregarding statutes, court rules and canons in the administration of justice.

2. Improper use of a judicial office to benefit friends.

3. Conduct giving rise to the appearance and substance of impropriety and partiality.

4. Gross lack of judicial temperament.

## 1. Disregarding Statutes, Court Rules and Canons in the Administration of Justice

The first example of respondent Del Rio's wilful disregard for the law and obligations imposed on him by virtue of his office appears in *People v Glen Bright,* Recorder's Court Case No. 75-02082, dated May 20, 1975. The Commission stated (referring to Judge Del Rio as "respondent"):

"Paragraph 5 of the complaint alleges that respondent disregarded the requirements of the statute and court rule requiring a presentence report before a judge passes sentence on a criminal defendant. In the case of *Glen Bright,* the initial charge was receiving and concealing stolen property over $100. The plea of guilty was to unlawfully taking away and driving an automo-

bile. When respondent accepted the plea at the pretrial, he told * * * counsel for the defendant, in an off-the-record, side-bar conference that he should acknowledge in open court that a presentence report had been reviewed by the judge and that a blank sheet of paper which the judge would hold in his hand was that presentence report which he had read. [Counsel] went back to the podium and together he and respondent put this lie into the record. Bright was sentenced to three years probation, with the first six months to be served in the House of Correction, to run concurrently with another sentence then being served.

" * * * In imposing sentence without a presentence report, respondent not only wilfully violated the statute and court rule, but caused the entry of a false judicial record which could well be deemed a subornation of perjury."

The record supports the Commission's finding. A presentence report is required upon conviction of a felony where an indeterminate sentence is to be imposed. MCLA 771.14; MSA 28.1144. In view of the importance of these reports to the defendant, society and the administration of justice, obtaining and reviewing such reports may not be waived. *People v Brown,* 393 Mich 174; 224 NW2d 38 (1974).

Also, Recorder's Court Rule 29 provides:

"Except in emergencies, remand before sentence for probation and psychiatric reports shall be for at least two (2) weeks, and each such report shall be in the hands of the sentencing judge at least twenty-four (24) hours prior to the time of sentence."

Accordingly, the statute and court rule were blatantly disregarded.

As a sequel, the following day, in the case of *People v James Alter,* Case No. 75-03099, after the defendant was found guilty by a jury before Judge

Del Rio, the Judge again suggested the same scenario and showed the same lawyer a piece of paper that appeared to be a "labor grievance form" and suggested that counsel state for the record that he had read the presentence report. However, before concluding, an actual presentence report involving a different case with this same defendant was obtained and reviewed. But the procedure was again irregular.

In *People v Norrell Johnson,* Case No. 74-02683, April 25, 1974, in affirming the Master's finding regarding this incident, the Commission found:

"Paragraph 22 of the complaint alleges that respondent was guilty of misconduct in the matter of *People v Norrell Johnson.* The charge in that case was assault with intent to do great bodily harm less than murder. The prosecutor was ready for trial. All thirteen witnesses for the people were present and ready to testify. A jury had been waived and respondent conducted a bench trial.

"During the testimony of the first witness, who was not the complaining witness, respondent, *sua sponte,* suggested to defense counsel the applicability of self-defense. At the close of this witness's testimony, and without hearing any of the other twelve prosecution witnesses testify, respondent told defense counsel that he would entertain a motion for a directed verdict of acquittal as he was convinced the first witness had started the incident and that the defendant was acting in self-defense. The motion was granted.

"The action of respondent showed clearly that he was not willing to try the case on its merits. Apparently he had decided before he came to the courtroom that he would acquit the defendant. The proofs were of no consequence to him. He lacked the sense of judicial decorum to even countenance a trial to arrive at his prearranged result."

During a bench trial, the "judge * * * shall

proceed to hear, try and determine such cause in accordance with the rules and in like manner as if such cause were being tried before a jury." MCLA 763.4; MSA 28.857. The court is duty-bound just as any juror not to form or express an opinion on the merits of the case until the case is submitted for determination. *People v Petrill,* 292 Mich 139, 144; 290 NW 358 (1940). GCR 1963, 515.1 provides for a motion for directed verdict only at the "close of the evidence offered by an opponent." The finding of the Commission is fully supported by the record. Judge Del Rio clearly disregarded duties imposed by statute and court rule.

Another example of respondent's improperly eschewing statutory responsibility is found in the case of *People v Holmes,* Case No. 74-04957, September 3, 1974. With respect to this case, the Commission found:

"As alleged in paragraph 6 of the complaint, a waiver trial was held before respondent in the case of *People v Jerry Lee Holmes* on September 3, 1974. The defendant was found guilty of robbery armed and unlawfully driving away an automobile. On September 10, 1974, the defendant was sentenced to concurrent terms of five years probation on each count. Assistant Prosecutor Ronald Schigur immediately informed respondent that the sentence was illegal. See *People v Davis,* 392 Mich 221 [220 NW2d 452] (1974), which holds probation as a sentence for armed robbery a void act beyond the jurisdictional power of the court.

"The next day, the sentencing was set aside. That day, a motion for a new trial was filed. The motion was based upon a supposed alibi defense, but it was unaccompanied by any affidavit of the putative witnesses, and, in fact, even failed to name them. On September 13, 1974, an order granting a new trial was signed. Immediately after the motion for a new trial was granted, and over the objection of the prosecutor, respondent accepted a guilty plea to a lesser-included and

probationable offense, assault with intent to rob being armed. The sentence of probation was the same one respondent had unsuccessfully tried to impose before.

"Respondent had apparently decided that he would grant probation despite any statutory prohibition. He circumvented the law by imposing his own personal brand of justice. The granting of the motion for new trial was more a ruse rather than an exercise of judicial discretion. By wilfully violating the law, he denigrated the judicial function."

A review of the record substantiates this determination. The finding by Judge Del Rio that the defendant was guilty of armed robbery legally obligated him to sentence the defendant to imprisonment for a term of years or for life. The court cannot impose probation upon conviction of such charge. MCLA 771.1; MSA 28.1131. The Commission's conclusion is fully justified.

Explicit examples of this Judge's disregard for legal obligations are also found in his handling of guilty pleas as alleged in paragraph 14 of the complaint. The blatant use of the threat of imprisonment, unless defendants pled guilty, permeated testimony in numerous cases. Recognizing this breach of judicial responsibility, the Commission correctly found:

"On January 27, 1975, Attorney Michael Sapala appeared at a pretrial conference before respondent in the case of *People v Dwight Williams.* The charge was possession of heroin. The defendant had been offered a possible plea to unlawful use and addiction. At a conference at side-bar, the Judge advised Sapala, 'You take him out in the hall and you talk to him because I'm sure he'll take a plea once you talk to him.' When Mr. Sapala returned to the courtroom, he informed the court that Mr. Williams did not wish to plead guilty. Mr. Williams informed the court he was innocent and wanted a trial. Respondent informed the defendant that

he was street wise, he knew where Williams was com-
ing from and that defendant had better plead guilty. He
sent Sapala and the defendant out into the hall again.
Upon their return, they were beckoned to the bench for
a third time. Respondent said: 'Look, you better take
this plea or your mother-fuckin' ass is dead.' Respon-
dent promised the defendant he would put him on
probation. A plea of nolo contendere was entered since
defendant insisted he would not admit his guilt. That
day, the defendant was put on probation without await-
ing a presentence report."

Another episode was also set forth by the Com-
mission:

"In *People v Jerry Tippett*, at the pretrial hearing,
respondent promised probation in return for a guilty
plea to a lesser included offense. Respondent promised
jail if the defendant insisted on a trial [on February 14,
1974, at a bench conference just before trial]. When
defendant Tippett continued to maintain his innocence
and insisted on a trial, respondent said: 'Fine, you
know, if I take a plea of the six-month misdemeanor,
I'm going to put you on probation, but if you go to trial
and you get convicted you'll have to get some time.'
Tippett was convicted.

"Although Tippett's personal circumstances produced
a recommendation of probation in the presentence re-
port, respondent sentenced him to one and one-half to
four years in the state penitentiary, and denied the
defendant an appeal bond.

"Mr. Fishman, attorney for Tippett, filed a motion for
resentencing setting forth the remarks by respondent at
the side-bar conference during the pretrial hearing.
When Mr. Fishman appeared on that motion on March
19, 1974, respondent had already prepared an opinion
and order which devoted five paragraphs to statements
that Mr. Fishman was incompetent. In sum, the opinion
was basically nothing more than an unwarranted scur-
rilous personal attack on the defense counsel, accusing
him of 'second-guessing' the court, being on an 'ego-trip'
and making promises of probation to the defendant and

his family. That respondent would have personal knowl-
edge of conversations between defense counsel, the
defendant, and the defendant's family is improbable,
but more importantly, the allegation was simply un-
true. It was a vindictive fabrication for respondent's
own purposes. At the hearing on March 19, respondent
showed the proposed opinion and order to Mr. Fishman
in an effort to coerce him into withdrawing his motion,
and went so far as to promise to 'help' him for coopera-
tion or to 'ruin' him for recalcitrance. Mr. Fishman
refused to foresake his duty to his client."

Aside from the unwarranted threat of imprison-
ment for demanding trial, coupled with a promise
of leniency if the defendant would "cop a plea",
the Tippett episode reveals a heavy-handed at-
tempt by a judicial officer to intimidate a lawyer
into surrendering a motion upon which his appel-
late right rested. This is intolerable.

In yet another case, the Commission properly
summarized the facts:

"Attorney James Howarth testified as to the events of
March 11, 1975, in the case of *People v Andrew and
McHenry Smith.* The charge was breaking and entering
an automobile, and the prosecuting attorney said there
would be no reduced plea. The defendants informed
defense counsel and respondent of their emphatic desire
to go to trial. Respondent requested the defendants and
defense counsel to approach the bench. An *ex parte*
communication ensued, the prosecutor not being pres-
ent. During the 'negotiations' about taking a plea,
respondent expressed the opinion he 'was quite certain
they would be found guilty'. Respondent then sought to
interpose himself between the defendants and their
attorney, saying:
    " 'I'm street [wise], just like both of you are, and your
attorney obviously does not have his shit together, and
I think you should be paying no attention to him and
you should be entering a plea in this case.'
    "The brothers still wanted a trial. Notwithstanding

that one of the brothers was in custody, respondent insisted that Mr. Howarth take his clients out into the hall and explain 'things' to them. When Mr. Howarth returned and informed respondent that the defendants would not plead guilty, respondent berated defense counsel and threatened him with contempt. Respondent again invited the defendants and their attorney to the bench and urged them to plead guilty. Despite extensive criminal convictions, including felonies, respondent promised leniency ('I won't hurt you.') and promised a personal bond if they pled guilty. On the record, however, respondent had defendants acknowledge that no promises were made to them, and their pleas of guilty were thereupon accepted. A personal bond was given the brother in custody pending sentencing. On March 19, 1975, the defendants were each sentenced to three years probation."

GCR 1963, 785.7, requires detailed questioning by the court to establish that a defendant entering a plea fully knows and understands his right to trial before a judge or a jury, and freely and voluntarily waives this right before pleading guilty. Any agreements are to be affirmatively stated on the record. The court is required to ascertain the existence of any coercion. Contrary to all these safeguards, Judge Del Rio himself improperly coerced pleas!

Furthermore, in the overall handling of guilty pleas, which take up a substantial portion of Recorder's Court activities, Judge Del Rio usurped the function of the prosecution by taking pleas over their objections; interjected extraneous matters into the trial process; appeared to grant probation solely because the defendant took a plea, irrespective of any other consideration; and often interfered with the attorney-client relationship.

These and other incidents, to say the least, display improper handling of guilty pleas.[11]

Aside from cases involving the handling of guilty pleas, the record made before the Judicial Tenure Commission reflects additional episodes where Judge Del Rio disregarded his judicial responsibilities under the law, rules and canons.[12]

## 2. Use of Office To Benefit Friends

There are several examples in the record of where the respondent improperly invoked the prestige and power of his judicial office in order to secure favors for friends or associates.

In the case of *People v Robert Smart,* Case No. 74-03327, as alleged in paragraph 4 of the complaint, Judge Del Rio demonstrated an undue and improper interest in the prosecution of the defendant. Complainant Delores Williams, a/k/a Delores Smart, sought to prosecute Robert Smart for aggravated assault. The Judge was on a first name basis with the complainant. Judge Del Rio contacted Lieutenant James Stack, the officer in charge of the First Precinct desk, at approximately 4:25 p.m., April 26, 1974, advised him he had complainant Delores Williams in his courtroom, and requested that arrangements be made for her transportation by scout car to the Thirteenth Precinct to make the preliminary complainant report and to have a warrant request prepared.

Then the Judge arranged to have an assistant prosecutor stay after hours in order that a warrant could be issued. The assistant prosecutor, in order to comply with this unprecedented request,

---

[11] For example, *People v Arthur Acosta* and *Julian Acosta,* Case No. 73-02431; *People v Willie Lee Jackson,* Case No. 74-02503; *People v James Alter,* Case No. 75-03099.

[12] For example, *People v Joseph Please,* Case No. 73-54792.

made arrangements to have the complainant transported by police vehicle to the prosecutor's office for the issuance of the warrant. Judge Del Rio was present at the prosecutor's office and attempted to apply pressure to assure the issuance of the warrant. Thereafter, the warrant was appropriately issued. Then the Judge arranged for the police to call him at his home as soon as the defendant was arrested.

Following the arrest, at 1:30 a.m., on April 27, the Judge called the police and directed them to deliver the prisoner to the First Precinct. A proceeding termed by the Judge as an "arraignment" on the charge of aggravated assault, commenced at 2 a.m. No reporter was present. The Judge repeatedly asked Smart for a plea; Smart consistently replied "not guilty". Surety bond was set at $2,500 and Smart was remanded to policy custody. Early the next morning in Judge Del Rio's courtroom, with no reporter present, Smart was again asked how he pled and once again he refused to plead guilty. Thereupon Judge Del Rio said: "If your ass had [pled] guilty, you [would] be on your way to Jackson now." Bail was subsequently reduced to $300. Judge Del Rio then pursued his personal interest in this case by appearing during the trial in the back of the trial judge's courtroom and standing with his hands on his hips, staring at Mr. Smart.

The foregoing reflects an extraordinary effort on behalf of Judge Del Rio to assist the female complainant who was a personal friend. His conduct reflected clear prejudice against the defendant and open disregard for the rule of judicial impartiality. It was also violative of Canons 4 and 5, and

especially Canon 13 of the Canons of Judicial Ethics.[13]

Another example where personal treatment occurred through the use of respondent's judicial office and its prestige, as alleged in paragraph 18 of the complaint, involved a traffic ticket that was issued to a friend of the Judge on January 15, 1975. Ms. Julia Marie Garwood was driving the Judge's car and the Judge was a passenger. She made an alleged prohibited left turn from eastbound Grand River on to northbound Woodward Avenue in Detroit. Upon being stopped, Judge Del Rio exited the car abruptly, announced who he was in an arrogant manner and attempted to explain why a traffic citation should not be issued. The Judge informed the police officers he had been in an accident and was on his way to a hospital. In direct contradiction, driver Garwood advised one of the officers in a separate conversation that she was lost because she was unfamiliar with the downtown area and was just driving around. She gave no indication that an accident had occurred or that she was proceeding to a hospital. A citation was issued.

[13] Canons of Judicial Ethics (applicable prior to October 1, 1974):

"Judicial Canon 4. Avoidance of Impropriety.

"A judge's official conduct should be free from impropriety and the appearance of impropriety; he should avoid infractions of law; and his personal behavior, not only upon the bench and in the performance of judicial duties, but also in his everyday life, should be beyond reproach."

"Judicial Canon 5. Essential Conduct.

"A judge should be temperate, attentive, patient, impartial, and since he is to administer the law and apply it to the facts, he should be studious of the principles of the law and diligent in endeavoring to ascertain the facts."

"Judicial Canon 13. Kinship or Influence.

"A judge should not act in a controversy where a near relative is a party; he should not suffer his conduct to justify the impression that any person can improperly influence him or unduly enjoy his favor, or that he is affected by the kinship, rank, position or influence of any party or other person."

Promptly thereafter, Judge Del Rio contacted the Commander of the First Precinct, Charles H. Jackson, and requested that he report to his chambers. The Judge explained to the Commander that someone else had been driving his car because he was in pain and was en route to the hospital. Judge Del Rio also mentioned another parking ticket involving his car and asserted that it was inappropriately issued. According to Commander Jackson, Judge Del Rio "indicated that he didn't think that he should have to go to court on them and that if he and I wouldn't resolve the matter, that he would deal with them in his own way". Commander Jackson testified he felt that the Judge's anger was directed toward the Police Department generally.

In order to resolve a conflict between the Department and the Judge, the Commander had the moving violation ticket cancelled.[14] Commander Jackson, a police officer for 21 years, testified he never had such a request from any other judge. This sequence of events constituted "ticket-fixing" in clear violation of Canons 1 and 2 of the Code of Judicial Conduct.[15]

---

[14] The parking violation was not prosecuted. While Judge Del Rio had good reason to question this citation, his manner was inappropriate.

[15] Code of Judicial Conduct (effective October 1, 1974):
"CANON 1.
"A Judge Should Uphold the Integrity and Independence of the Judiciary.
"An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary. The provisions of this Code should be construed and applied to further those objectives."
"CANON 2.
"A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities.

The machinations involving the assignment of
the case *People v Irwin L Goldfarb,* Case No. 75-
52692, as alleged in paragraph 11 of the com-
plaint, further exhibits improper use of his office
by the Judge to benefit friends.

Mr. Goldfarb is a licensed bail bondsman and is
associated with a bonding firm with offices one
block from Recorder's Court. He was charged in a
complaint with assault and battery. On April 22,
1975, he was arraigned and demanded a jury trial
before Judge Kadela, a visiting Recorder's Court
judge. The trial date was set for June 23, 1975.
Recorder's Court Rule 7, § 4, required this judge to
retain the case for disposition on the scheduled
date. Commencing Monday, May 12th, Judge
Kadela, however, was absent from Recorder's
Court for approximately three weeks. On Friday
morning, May 9th, Judge Del Rio was on his way
to work when he saw the assistant prosecuting
attorney assigned to Judge Kadela's court and
advised him on a street corner that the Goldfarb
case would be tried Monday, May 12th and that he
should have his witnesses present and ready to
testify.

Norman Zemke, the attorney for Goldfarb, first
received notification by telephone on May 9th that

"A. Public confidence in the judiciary is eroded by irresponsible or
improper conduct by judges. A judge must avoid all impropriety and
appearance of impropriety. He must expect to be the subject of
constant public scrutiny. He must therefore accept restrictions on his
conduct that might be viewed as burdensome by the ordinary citizen
and should do so freely and willingly.

"B. A judge should respect and observe the law and should conduct
himself at all times in a manner that promotes public confidence in
the integrity and impartiality of the judiciary.

"C. A judge should not allow his family, social, or other relation-
ships to influence his judicial conduct or judgment. He should not use
the prestige of his office to advance the business interests of himself
or others. He should not appear as a witness in a court proceeding
unless subpoenaed.

"D. A judge may respond to requests for personal references."

he should be in court the next Monday and ready
to proceed with the Goldfarb case. Zemke later
testified he had no knowledge of how the trial date
for the case had been accelerated. On Monday,
Judge Del Rio took the misdemeanor call for the
absent Judge Kadela. Counsel Zemke, having just
received notice the previous Friday of the change
in scheduling, requested an adjournment. The ad-
journment was denied following this exchange:

"*The Clerk:* All parties step up in the Irwin Goldfarb
case, 75-52692, charge assault and battery.

"*Mr. Vickers:* Miss Westbrooks.

"*Mr. Zemke:* May it please the court. I'd like to ask
the court to adjourn this matter. It's been scheduled for
the * * * over to the 24th of June and I'm not able to
have my witnesses here this morning.

"*The Court (Judge Del Rio):* All the people are here
this morning, I don't see what the problem is.

"*Mr. Zemke:* Pardon, your Honor?

"*The Court:* I don't see what the problem is. I think I
can weed through this one with or without some more
witnesses.

"*Mr. Zemke:* All right.

"*The Court:* Most of them have accumulative *[sic]*
testimony anyhow."

Although Zemke had originally requested a jury
trial, it was then waived and a bench trial was
conducted. The prosecutor presented the complain-
ing witness as well as another witness. Mr. Gold-
farb took the stand and denied the allegation.

Judge Del Rio withheld his determination, but
later prepared a written opinion finding Mr. Gold-
farb not guilty. Mr. Vickers, an assistant prosecut-
ing attorney who had handled thousands of misde-
meanor cases, later testified he recalled but one
other written opinion involving a misdemeanor
case.

Judge Del Rio's actions regarding this case clearly create an appearance of the use of his office for the benefit of acquaintances. Although he was not the regularly assigned trial judge he was obviously cognizant of the matter; contacted counsel before he would temporarily replace Judge Kadela for one day; with little notice to either counsel and at the request of neither advanced the trial date to the first day of Judge Kadela's absence (when Judge Del Rio would conveniently be presiding); proceeded with the trial over the objection of the defense counsel and then dismissed the charge. By using his office to benefit friends, Judge Del Rio violated Canons 1 and 2 of the Code of Judicial Conduct.[16]

### 3. Conduct Giving Rise To The Appearance And Substance Of Impropriety And Partiality

The attempt to secure the transfer of the case of *People v Ronald Garrett,* on May 28, 1975, and subsequent events, as alleged in paragraphs 9 and 10 of the complaint, clearly reflect a serious lack of judicial propriety and the presence of partiality. Ronald Garrett was charged with possession of heroin with the intent to deliver and possession of heroin. His case was assigned to Judge Geraldine Bledsoe Ford and was set for trial. On May 28, 1975, Attorney Milton Henry requested that Judge Del Rio assist him in having the case transferred from the docket of Judge Ford to his own docket. Judge Del Rio agreed. His clerk supplied Henry with a transfer order form. This transfer form required the signatures of both the judge to whom the case was assigned as well as the signature of the judge to whom the case was to be transferred.

---

[16] *See* Canons 1 and 2, *supra.*

Judge Del Rio's signature appeared on the proposed stipulation.

Mr. Henry took the order to Judge Ford's courtroom to obtain her signature. After considering the request, Judge Ford declined to sign the transfer order and rejected the request. Later on the same day, Wednesday, May 28, 1975, at the monthly judges' meeting, Judge Del Rio personally presented the same order to Judge Ford and requested that she sign it so that the case could be transferred to him. In making his request, Judge Del Rio urged Judge Ford to reconsider, stating, "other judges transfer their cases to me". Judge Ford again refused. She later testified at no other time had she ever been approached by another judge to have a specific case transferred from her docket to another judge's docket.

The partiality and impropriety of this transfer attempt is brought into clear focus by what transpired that same evening (May 28, 1975). During that evening, Judge Del Rio, at the request of counsel Henry, personally accompanied Henry to the First Precinct of the Detroit Police Department to secure the release of the same Ronald Garrett, who had been arrested earlier that evening on the separate charge of resisting and obstructing a police officer. Upon securing Garrett's release, Mr. Garrett, Mr. Henry and Judge Del Rio together, in the process of leaving the headquarters, alighted from an elevator when defendant Garrett sighted Sergeant Robert Michalek standing at the station desk. Garrett shouted an obscenity and pointed to Sergeant Michalek as the officer who took his "license off the wall". Garrett, Henry and Judge Del Rio approached Michalek and entered into an acrimonious confrontation with him. Judge Del Rio grabbed Sergeant Michalek's shoul-

der, spun him around and poked him in the chest. According to Sergeant Michalek, as corroborated by Officer Lionel Dickens, the following conversation transpired between Judge Del Rio and Michalek:

"I'll touch you or push you around any time I want to. As a matter of fact, court is now in session. You're in my courtroom, and if you open up your mouth I'm going to hold you in contempt of court.

"And he said, 'Did you take anything from this man's property?'

"I said, 'Not today.'

"And I said, 'I took a license.'

"And he said, 'Well, I order you to return the man's license.'

"And I said, 'I'll have to contact somebody from the Legal Department.'

"He said, 'I'm ordering you to return that man's license, and keep your mouth shut or else I told you I'm going to hold you in contempt of court.' "

Thereafter, the three left the precinct station together. The impropriety and partiality of these events are obvious. Judge Del Rio was in clear violation of Canons 1, 2 and 3A(3) of the Code of Judicial Conduct.[17] He also clearly abused his contempt power.

In another episode, as alleged in paragraph 20 of the complaint, Judge Del Rio gave the appearance of judicial impropriety by his harassment of a police officer. In its recommendation to the Court, the Commission found:

"Respondent had presided over a narcotics case in which one of the original three codefendants was Gloria Jean Bobo. The charges against Miss Bobo were dis-

---

[17] *See* Canons 1 and 2, *supra;* Canon 3A(3), *infra.*

missed at a preliminary examination before another judge.

"Judge Del Rio was talking to Lt. Richard Reese and officer Geoffrey Taft, of the Police Department's Internal Affairs Section, with regard to another matter. In the course of the conversation, respondent got into a discussion about Scott and Coleman who had been codefendants in Miss Bobo's case. Respondent in a fit of boastfulness recalled he had met Miss Bobo in a bar and thereafter spent the night with her. He went on to say that 'she was a foxy little bitch * * * and she was a good piece of ass'.

"Lt. Reese was quite surprised and chagrined to hear a judge boasting of his sexual participation with a former criminal defendant. As a result, he prepared a memorandum about the incident which he forwarded to his superiors.

"Respondent learned of this memorandum and exhibited his vindictiveness by improper and heavy-handed efforts to impair Reese's credibility and impede his police career. Reese, nevertheless, had the fortitude to reaffirm by testimony before the Master what he had placed in his memorandum on the date the incident occurred * * * ."

Once again, Judge Del Rio's conduct gives rise to the appearance of judicial impropriety in clear violation of Canons 1 and 2 of the Code of Judicial Conduct.[18]

The record is replete with other examples of misconduct by Judge Del Rio which give rise to both the appearance and substance of impropriety and partiality. These transactions involve:

(1) *ex parte* communications with a complaining witness just before a bench trial;[19]

(2) improper involvement in the case assignment

---

[18] The appearance of judicial impropriety primarily relates to the intimidation tactics and official abuse exhibited by the Judge in an abortive attempt to silence the officer. The distasteful language speaks for itself.

[19] *People v Joseph Please, supra;* paragraph 8 of Formal Complaint No. 18.

process in order to transfer a specific case in which the Judge had some interest;[20]

(3) and oral statements expressing his opinion that a particular defendant was guilty before the *bench* trial even occurred.[21]

The litany of such improper transactions deeply shocks this Court's sense of judicial decorum.

The actions of Judge Del Rio concerning the remission of forfeited bail bonds, as alleged in the amended complaint, also reflect impropriety and partiality.

Between May 4, 1974, and September 11, 1974, a total of 44 *ex parte* orders were approved by Judge Del Rio remitting approximately $40,000 to Charles B. and Irwin L. Goldfarb, professional bondsmen. Several key factors permeate these transactions:

1. Each of the bail bonds had been originally forfeited under a judgment of forfeiture entered by a judge of the Recorder's Court other than Judge Del Rio. None of the cases was transferred by written order from the original judge to Judge Del Rio as required by Recorder's Court Rule 16, § 11. No one could explain how all the files found their way to Judge Del Rio's courtroom. By such action, Judge Del Rio usurped the jurisdiction of the original judge and entered orders setting aside bond forfeitures that the original judge had explicitly ordered. This violated MCLA 726.2; MSA 27.3552, which provides: " * * * no judge of said court shall review or revise any order, judgment, sentence or act of any other judge of said court, involving the personal discretion, judgment or opinion of such other judge". In an effort to ascer-

---

[20] *People v Quinton Jackson,* Case No. 74-03704; paragraph 13 of Formal Complaint No. 18.

[21] *People v Marcus Hoover,* Case No. 73-07778; paragraph 23 of Formal Complaint No. 18.

tain the circumstances under which the remission orders were entered, the bondsmen, Charles Goldfarb, and his attorney were subpoenaed. Both refused to answer pertinent questions; rather, they invoked their Fifth Amendment right or their lawyer-client privilege.

2. Every order setting aside a bond forfeiture and remitting the bail previously transferred to the general fund of the Wayne County Treasurer was effectuated on an *ex parte* basis. No notice was given to the prosecuting attorney as required by GCR 1963, 772.4. Nor was appropriate notice given to the corporation counsel. The requirement that a praecipe be filed pursuant to Recorder's Court Rule 18, § 3, was also ignored. Accordingly, approximately $40,000 of county funds were ordered remitted without either notice to the county or consultation with the county.

3. Furthermore, the proceedings in which nearly all of these orders were approved were conducted on weekends on a wholesale basis when court was not normally in session. On Saturday, May 4, 1974, six orders were approved; on Saturday, June 15, 1974, 23 orders were signed; and on Sunday, September 8, 1974, 10 orders were approved, involving a total refund of nearly $37,000. The regular motion day for Recorder's Court is Tuesday. Recorder's Court Rule 18, § 2. The entry of such orders on weekends precluded the possible presence, even inadvertently, of a representative from the prosecutor's office or a member of the public.

4. Approximately 40 of the 44 original orders of forfeiture were entered in 1969 or before. No reasons were given for the substantial delay in filing most of these petitions. Nor was any application made before the appropriate judge.

5. In four of the cases, specific petitions to set

aside the bond forfeiture and remit the bond penalty had been denied previously by the very judge who had approved the forfeiture initially. In one case, a return of funds was ordered even though neither Charles nor Irwin Goldfarb had posted the bond in the first instance. Obviously, this reflects haste, pre-arrangement and lack of impartial attention. It is no surprise that not one of 44 petitions to set aside bond forfeitures and remit the penalty submitted by the Goldfarbs or their agents was denied by Judge Del Rio.

Irrespective of the possible merits of the individual petitions, the unlawful manner and clandestine method in which these motions were handled by Judge Del Rio, in consort with Charles Goldfarb, is clearly partial and improper.[22]

Impartiality, although a difficult goal to achieve with perfection, must be relentlessly pursued in order to insure the rendering of fair, just determinations and to enhance public confidence in the judiciary.

*In the Matter of Spitalnick,* 63 NJ 429, 431; 308 A2d 1 (1973), the Supreme Court of New Jersey found that a judge had attempted to "fix" a traffic ticket for a former client. The Court's opinion stated:

"Significantly, he acted without regard for the plain requirements of the law which he was sworn to uphold. His conduct did violence to the fundamental principle of disinterested justice which is the bulwark of our judicial system."

In another recent case, *In re Diener,* 268 Md 659, 671; 304 A2d 587 (1973), *cert den,* 415 US 989

---

[22] Aside from the stated statute and court rules, these actions are violative of Canons 4, 5, 13 and 16 of the Canons of Judicial Ethics and Canons 1 and 2 of the Code of Judicial Conduct (when applicable).

(1974), the Maryland Supreme Court addressed itself to the situation of a judge having failed to scrupulously adhere to the principles of impartiality:

"We have not the smallest doubt, however, that the disposition of cases for reasons other than an honest appraisal of the facts and the law, as disclosed by the evidence presented, will amount to conduct prejudicial to the proper administration of justice whenever and however it may be defined or whoever does the defining."

The high standards of impartiality required and expected of judicial officers in this state will not countenance favoritism. As was stated *In re Bolte,* 97 App Div 551, 574; 90 NYS 499 (1904):

"Favoritism in the performance of judicial duties constitutes corruption as disastrous in its consequence as if the judicial officer received and was moved by a bribe."

## 4. Gross Lack of Judicial Temperament

The Code of Judicial Conduct now in effect states:

"A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control." Canon 3A(3).

"A judge should respect and observe the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 2B.

The Canons of Judicial Ethics, effective until October 1, 1974, stated:

"Essential Conduct.
"A judge should be temperate, attentive, patient, impartial, and since he is to administer the law and apply it to the facts, he should be studious of the principles of the law and diligent in endeavoring to ascertain the facts." Canon 5.
"Consideration for Jurors and Others.
"A judge should be considerate of jurors, witnesses and others in attendance upon the court." Canon 9.
"Courtesy and Civility.
"A judge should be courteous to counsel, especially to those who are young and inexperienced, and also to all others appearing or concerned in the administration of justice in the court.
"He should also require, and, so far as his power extends, enforce on the part of clerks, court officers and counsel civility and courtesy to the court and to the jurors, witnesses, litigants and others having business in the court." Canon 10.

Proper judicial temperament is an essential ingredient in the dispensation and administration of justice. It is displayed when a judge discharges his duties in a professional manner with patience, courtesy and dignity.

Among other allegations, Judge Del Rio was charged with having repeatedly and persistently (1) "subjected counsel, spectators, litigants and witnesses appearing before him to discourtesy, harassment, unjust criticism and abuse"; (2) "abused the power of contempt inherent in his office"; (3) "been intemperate, discourteous and injudicious" toward members of the general public.

Upon a total review of these assertions, although some isolated incidents are without merit, Judge Del Rio's activities when evaluated *in toto* create a

pattern of conduct and temperament totally unbecoming a member of the judiciary.

The following incidents involving respondent serve to illustrate his gross lack of judicial temperament, as alleged in paragraph 15 of the complaint.

In June, 1974, Robert Horn, an assistant prosecuting attorney, was trying a rape case in front of Judge Del Rio without a jury. The Judge persisted in talking on the telephone while on the bench during critical testimony from the complainant and the second witness. Mr. Horn respectfully requested the Judge to devote his full attention to the testimony. Judge Del Rio became enraged. He ordered Mr. Horn into his chambers and then proceeded to inflict upon the prosecutor an unwarranted and insulting tongue-lashing, while threatening him with contempt. Thereafter, he announced on the record in open court that he was going to seek to remove counsel from the case. Although he allowed the prosecutor to complete his case, Judge Del Rio addressed numerous critical and humiliating remarks toward counsel. At the close of the case, he ordered Mr. Horn never to return to his court.

Shortly after leaving the courtroom, upon the request of the complainant, Mr. Horn returned to obtain police protection for her. But before he could make such a request and explain his reason, he was arrested and placed in the prisoners' box upon Judge Del Rio's demand; he remained there for over 30 minutes before his superiors procured his release.

On another occasion, Terrance Boyle, an assistant prosecuting attorney, was directed by Judge Del Rio to deliver a vulgar and belligerent message to the Wayne County Prosecutor.[23] Judge Del

Rio also threatened Mr. Boyle and his wife, who was then also an assistant prosecuting attorney, with political pressure if they should ever decide to seek public office. He declared he would "do everything to defeat you and I've never lost on a matter like that".

In yet another episode, Mr. Michael Sapala, a defense attorney, attempted to serve a notice of appeal on Judge Del Rio as a favor to another lawyer. The Judge first ordered counsel to remain in the courtroom and later had him brought back into chambers. He berated the lawyer for approximately one-half hour and then told him to keep out of his court.[24] Subsequently, the Judge referred

---

[23] " * * * He leaned over the bench and looked at me and said, 'Mr. Boyle, I asked to see the prosecutor, and I would prefer that Mr. Cahalan be down here because he understands these kinds of things. But as long as he sent you down here, I've got a message for you to take back to him. I'm telling you that you are his lieutenant and you've been saying some things and doing some things in this Jackson case, and you go back and you tell him that if any of his lieutenants shoots an arrow into me, I've got a tough hide, it will stick, and then I'm going to pull it out and I'm going to cram it up Bill Cahalan's ass and then I'm going to break it off.' "

"And he said, 'Now do you understand me?'

"And I said, 'I think, Judge, we understand each other.'

"Whereupon he said, 'You're just pissed off because a black man got a little bit of white pussy in this case. That's all that matters.'

"I said, 'Judge, you're wrong. What really matters is that there was a matter of absence of consent in the case.'

"And he said, 'Well, never mind. I'm just telling you. You carry that message to Cahalan. Do you think you can do that word-for-word?'

"And I said, 'Judge, I'll convey that message to the Prosecutor for the County of Wayne word-for-word.' "

[24] Michael Sapala testified:

"*Q:* What did he say?

"*A:* He called me a non-dues, mother-fucking white liberal. He said I would not have conducted myself in that manner before either Judge Ford or Judge Crockett, that I was treating him with absolute and total disrespect, that I had disrupted the orderly processes of his courtroom.

"During this time I asked him if he were going to find me in contempt. He did not respond to that. I asked him if I was free to go. He did not respond to that. He essentially went on for a half hour berating me.

to this lawyer sarcastically in public and warned him that if he testified at the judicial tenure hearing, the Judge's lawyer "would take care of him".

Another defense attorney, Elizabeth Jacobs, was in Judge Del Rio's chambers on one occasion when he boasted about his sex life. Later, on another occasion, Ms. Jacobs was called for a bench conference while court was in session, whereupon Judge Del Rio asked her for a date. She declined the offer.[25] Thereafter, whenever she appeared before the Judge, she was often treated with disdain.

A final example of respondent's intemperate attitude toward counsel was appropriately set forth by the Commission:

"Patricia Boyle, previously an assistant prosecuting attorney in charge of appeals, is currently a Recorder's Court judge. She, like her husband, Terry Boyle, assistant prosecuting attorney, was caustically abused by the respondent.

"Judge Del Rio apparently viewed any appeal of his decisions by the prosecutor's office as personal attacks on his character. He many times threatened and attempted to intimidate Mrs. Boyle in the pursuit of her assigned tasks. At one point, Judge Del Rio told her superior, 'I want you to explain to this honkie bitch who I am, and I want her to understand that I'll not

---

"After some point in time, perhaps · fifteen or twenty minutes, another court officer came back and informed the Judge that there were two attorneys out there that ought to be present, because they wanted to represent me should I be in the position of being cited for contempt of court. And the Judge told his officers to refuse admittance to these two lawyers. Those lawyers being John Barkai and Neal Bush. I assume the officer did that, because those attorneys never came back. I continued to ask the Judge if I was in contempt of court, and he never responded. Finally, about a half hour, he just told me to get my ass out of his court."

[25] In a separate incident, Mr. Sapala testified that during a recess he overheard Judge Del Rio in the cafeteria of the Frank Murphy Hall of Justice, speak to a female juror assigned to a case in progress in front of him. He asked whether it would be all right if he were to call her when the case was over.

put up with any bullshit ego trips of somebody in the prosecutor's office.'

"Judge Del Rio frequently attempted to use his judicial position to circumvent and obstruct Mrs. Boyle in the discharge of her official duties. He even stated that irrespective of what the Court of Appeals did with a particular case, when it returned to his court, he would see that it would turn out the way he wanted it to. At one point he said to Mrs. Boyle: 'I know a lot about you, and I know a lot about your husband, and I've got a lot on both of you, and I want you to understand that if you keep this up, you're going to regret it because I see a lot and I know a lot and you'll be sorry for what you are doing.' "

The foregoing incident stands unrebutted.[26]

One of Judge Del Rio's favorite tactics is to brandish, threaten and invoke unnecessarily the awesome power of contempt. The failure to use this ultimate power with restraint in order to maintain decorum reflects conduct unbecoming a judicial officer. We have already noted his abuse of the contempt power in a police station as well as various other episodes within the confines of the courtroom.

Additional proofs were adduced which support the allegations set forth in paragraph 16 of the complaint that the respondent improperly used his contempt power. For example, defense attorney Thomas McGuire was the object of the Judge's

---

[26] This Court concludes that the finding of the Judicial Tenure Commission regarding a separate occurrence involving different counsel, as alleged in paragraph 19 of the complaint, is essentially correct:

"Mr. Norman Lippitt, counsel for the Detroit Police Officers Association, on February 6, 1973, attempted to protect the rights of several police officers testifying in Judge Del Rio's court. Immediately upon entering the courtroom, he was ordered back into the respondent's chambers. In chambers, Mr. Lippitt and his associate counsel were subjected to an angry and irrational tirade by Judge Del Rio. Furthermore, respondent included in his outburst an ethnic slur and obscenity aimed at Mr. Lippitt and concluded with a challenge to a fist fight."

wrath when he could not secure the presence of his client at a pretrial hearing, which was rescheduled from a previous date. McGuire was held in the prisoners' box for nearly one hour at the Judge's command.

On another occasion, in order to emphasize the importance of maintaining decorum in a courtroom, Judge Del Rio ordered an 11-year-old student to be locked up alone for a half-hour in the bullpen for causing a disturbance in the courtroom during a school field-trip visit.

Persons who may be categorized as members of the general public, as alleged in paragraph 21, have also faced the wrath and scorn of Judge Del Rio. The record indicates that on several occasions the Judge abused members of the media by communicating with them in a manner unbecoming his office.[27]

The California Supreme Court recently addressed itself to a case involving judicial temperament and the abuse of the power of contempt. In *Cannon v Commission on Judicial Qualifications,* 14 Cal 3d 678, 702, fn 19; 122 Cal Rptr 778; 537 P2d 898 (1975), that court adopted the commission's conclusion:

---

[27] The findings of the Judicial Tenure Commission with respect to this allegation are essentially correct and stated:

"Mr. Peter Waldmeir is a columnist for *The Detroit News.* An article for his newspaper apparently angered Judge Del Rio. Respondent phoned Mr. Waldmeir, verbally abused and threatened him and made vulgar and obscene remarks.

"Miss Judy Diebolt is a reporter for the *Detroit Free Press.* Judge Del Rio made baseless accusations about Miss Diebolt and subjected her to public discourtesies. Thereafter, he asked Miss Diebolt to come into his chambers where he engaged in an undignified harangue about her newspaper being racist and, further, warned her, 'not to fuck around with him'.

"Sometime thereafter, the respondent, in a mellower mood, asked Miss Diebolt for a date, which she refused. Judge Del Rio responded to her refusal with a tasteless and insulting inquiry as to whether she was a lesbian. Thereafter, whenever Miss Diebolt would come into court, the respondent would seize upon the opportunity to verbally embarrass and abuse her."

"Petitioner's conduct was arbitrary, unreasonable and in bad faith, and constituted wilful misconduct in office. Petitioner not only used profane, abusive and inexcusable language, but she also misused the authority of her office by ordering persons to appear in her court where no matters were pending requiring their attendance and by directing her bailiffs to use force if they attempted to leave."

Also, in *McCartney v Commission on Judicial Qualifications,* 12 Cal 3d 512, 534; 116 Cal Rptr 260; 526 P2d 268 (1974), that court held:

"we further conclude that the conduct which has prejudiced the administration of justice and cast the judicial office into disrepute, is petitioner's proven intemperance with court personnel, defendants in criminal cases, and attorneys."

The responsibility of judicial officers, with respect to handling litigants, counsel and all who may appear before them was also addressed in *Peterson v Knutson,* 305 Minn 53, 58–59; 233 NW2d 716, 719 (1975):

"The charge that one called upon to exercise judicial responsibility is biased, abusive, or unfair, is one which must always be considered carefully. This is so because the major responsibilities which have been entrusted to our judiciary cannot be adequately discharged without public support based upon a widespread confidence and popularly shared belief that judges treat all those coming before them fairly, courteously, respectfully, and without prejudice. As a matter of duty, judges must so treat all parties before them regardless of the identity of the parties, the nature of the problems they are called upon to deal with, or any other consideration."

It was stated by the Supreme Court of Oklahoma over 50 years ago:

"It is a matter of profound regret when a man is elected to office that he should forget that he is chosen by the people to be a servant for them in the administration of the affairs of the office, and that he should forget to be courteous and reasonable with persons having business with the office, and that he should assume an austere, egotistical, dogmatic, and tyrannical attitude toward the public and those assisting him in the administration of the office." *Robberson v Noble County Board of Commissioners,* 109 Okla 249, 252; 235 P 525 (1924).

By his actions and conduct, Judge James Del Rio forgot he was chosen by the people to be their servant. On an habitual basis he forgot to be courteous and reasonable with persons having business with his judicial office. The canons and code set fair standards for judicial temperament; Judge Del Rio repeatedly chose to violate them. Judge Del Rio, a master of intimidation, displays through his bizarre behavior a gross lack of judicial temperament.

By his actions Judge Del Rio disregarded statutes, court rules and canons, improperly used his office to benefit friends, gave rise to the appearance and substance of impropriety and partiality, and displayed gross lack of judicial temperament. The cumulative effect of all such conduct constitutes misconduct in office and is conduct clearly prejudicial to the administration of justice.

## CONCLUSION

"For unto whomsoever much is given, of him shall be much required: and to whom men have committed much, of him they will ask the more." Luke 12:48.

The opinion of this Court has dwelt at length on both the procedural and substantive issues raised

by the respondent, and rightfully so. However, looking beyond all the technical legal issues, we perceive the *real* issue in this case to be the preservation of the integrity of the judicial system.

The functions and decisions of a judge have an incalculable impact on the community at large. A citizen's experience with the law is often confined to contact with the courts. Therefore, it is important not only that the integrity of the judiciary be preserved but that the appearance of that integrity be maintained.

Francis Bacon, in *Of Judicature,* spoke to this very issue in the 16th Century:

"The place of justice is a hallowed place and therefore not only the Bench, but the foot-pace and precincts and purpose thereof ought to be preserved without scandal and corruption." (See *Works of Lord Bacon* [Murphy, ed, 1876], p 59.)

In *Roy v Jones, supra,* 319, the court made a similar observation quoting *In re Greenberg,* 442 Pa 411, 415; 280 A2d 370 (1971), and Tamm, *Are Courts Going the Way of the Dinosaur?,* 57 ABA J 229 (March, 1971):

"For generations before and since it has been taught that a judge must possess the confidence of the community; that he must not only be independent and honest, but, equally important, believed by all men to be independent and honest. A cloud of witnesses testify that 'justice must not only be done, it must be seen to be done.' Without the appearance as well as the fact of justice, respect for the law vanishes in a democracy."

Judge Del Rio has seen fit to flout the sacred office which was entrusted to his stewardship by the public. And, by doing so, he has not only brought disgrace upon himself and his court, but

he has given the public pause to question the very cornerstone of our democracy: an honest and independent judiciary.

As Chief Justice Marshall stated in *Marbury v Madison,* 5 US (1 Cranch) 137; 2 L Ed 60 (1803), it is, "emphatically, the province and duty of the judicial department, to say what the law is". But then the question arises "Who shall keep the keepers?" Juvenal, *The Satires,* book 6, line 347. ("Quis custodiet ipsos custodes?") Who shall be responsible for putting the judiciary's house in order? *Keiser v Bell, supra,* 623.

The Michigan Constitution of 1963, art 6, § 30, vests this solemn responsibility in our Supreme Court. Our Court, pursuant to this authority, has passed GCR 1963, 932. This court rule establishes an orderly process through which this Court can effectively police abuses by members of the judiciary and thus effectively "put our own house in order".

It is through this rule and its orderly procedures that the truth about the excesses of Judge Del Rio was brought to our attention. Therefore, pursuant to the authority vested in us by the Constitution and GCR 1963, 932, we order that Judge Del Rio shall not sit as a judge in a Michigan state court until the expiration of this suspension. That suspension shall expire five years from the date of this decision. During his suspension, Judge Del Rio shall receive no judicial salary. Furthermore, this order shall apply regardless of respondent's possible re-election to his present judicial office or election to any other state judicial office. Pursuant to GCR 1963, 866, the clerk of this Court is ordered to issue final process immediately upon the release of this opinion.

COLEMAN, FITZGERALD, BLAIR MOODY, JR., and WILLIAMS, JJ., concurred.

KAVANAGH, C. J., and LEVIN, J., concurred in the result.

## ADDENDUM

WILLIAMS, J. I concur with this Court's analysis and I concur with the result because I believe the power to remove extends only to the existing term of office then held.

RYAN, J. *(concurring in part).* I concur in the Court's judgment that Judge Del Rio is guilty of misconduct in office and of conduct prejudicial to the administration of justice. However, I would adopt the recommendation of the Judicial Tenure Commission that he be removed from office and would enjoin him from serving in any state judicial office in the future.